NORA SPRINGS COOPERATIVE
COMPANY, Appellant,

v.

Chester BRANDAU, Appellee.

No. 2–57699.

Supreme Court of Iowa.

Dec. 15, 1976.

James F. Smith of Zastrow, Noah & Smith, Charles City, and Linnan, Lynch & Peterson, Algona, for appellant.

Erwin Larson of Larson & Carr, Charles City, for appellees.

Heard by MOORE, C. J., and RAWLINGS, LeGRAND, REYNOLDSON and HARRIS, JJ.

MOORE, Chief Justice.

Plaintiff-elevator company appeals from judgment denying damages for defendant-farmer's alleged breach of corn sale contracts. We affirm.

On December 16, 1972 the parties executed three written contracts which provided that defendant-farmer would deliver 89,000 bushels of corn to plaintiff elevator on the following terms: 17,000 bushels to be delivered on or before December 1972 or January 1973 at $1.40/bushel; 20,000 bushels to be delivered at the same time and price; 52,000 bushels were to be delivered on or before July 1973 at $1.37/bushel. At the time of executing these contracts defendant Brandau had on hand in excess of 125,000 bushels of wet corn, much of which he could not dry because of his inability to secure L.P. gas.

Defendant began delivering the corn in December 1972. However, he was stopped by Ted Arndt, plaintiff-elevator manager, and told to wait until later in January when he would have more railroad cars to transport the grain to Cargill, the ultimate purchaser.

In January, Mr. Brandau made numerous deliveries but was told he could not deliver more because the elevator facilities were full. By this time the wet corn which was to have been delivered under the December-January contracts was beginning to spoil. In February, he made additional deliveries and was again prevented from completing delivery.

Thereafter, defendant testified he talked to Arndt or his assistant three or four times a week in February through March asking to make deliveries. Arndt conceded the calls were frequent but stated he was unable to accept delivery because of a shortage of railroad boxcars required for shipment to Cargill. Arndt denied, however, that he had breached the contract and stated, "I did not refuse his corn and I couldn't take it at the time he wanted to deliver it."

Arndt further testified the elevator's contracts with Cargill expressly provided for shipment by rail although the individual contracts with defendant did not so provide. He explained that although he never attempted to get trucks as an alternative means of transportation, this was justified because the extra cost made this practice prohibitive.

Despite these delays which resulted in further deterioration of his corn due to moisture and "blue-eye damage", and thus resultant price discounts, defendant made deliveries when plaintiff would accept them throughout the months of April, May, June and July. At the end of that period he finally completed delivery of the two December-January contracts and was ready, willing and able to begin performing his obligations under the July contract. He made his final delivery on July 27, 1973 when he was once again subject to the same tactics of delay.

Whether this railway car shortage existed throughout the entire period between January and July was subject to conflicting

testimony from Arndt and William Cole, Milwaukee Railroad Agent. Cole indicated there was no boxcar shortage until April 1973. It is at least clear from examination of the record that over 698,000 bushels of noncontract grain exceeding the amount contracted with defendant were purchased from other members of the cooperative during this same time period.

On August 20, 1973 Arndt was told by a trucker employed by defendant that defendant was hauling grain to the Orchard, Iowa elevator. Thereafter Arndt called defendant and stated he could take more grain. Defendant replied he was through hauling corn to plaintiff-elevator and that he considered the July corn contract to be null and void. Subsequently he hauled his corn to Orchard, with price discounts due to deterioration. It is undisputed that prior to the cancellation, defendant never indicated to plaintiff he was taking the grain elsewhere.

When defendant refused to honor the contracts this present litigation ensued. The lower court found there was no excuse for plaintiff's nonacceptance of the grain which defendant had in good faith tendered for delivery on several occasions and concluded that any waiver of time for acceptance was effectively retracted on August 20, 1973. Judgment was then entered for defendant.

On this appeal appellant-elevator asserts 1) the unavailability of railroad boxcars constituted excuse for nonacceptance, 2) alternately, appellee waived his right to rescind the contracts by acquiescing in the delay, 3) appellee was required to give notice of intent to rescind in order to effectively retract his waiver, 4) the elevator's breach of contract was too insubstantial to warrant defendant's rescission and 5) appellee failed to act in "good faith" because he did not provide a final opportunity to accept delivery of the corn prior to selling it elsewhere.

■ I. We review this law action on errors assigned. Findings of fact by the trial court have the effect of a special verdict and if supported by substantial evidence they are binding on us and will not be disturbed. Furthermore, we view the evidence in a light most favorable to the judgment and in case of ambiguity construe to uphold, rather than defeat the judgment. Rule 344(f)(1), Rules of Civil Procedure; *Sand Seed Service, Inc. v. Bainbridge*, Iowa, 246 N.W.2d 911 (filed November 17, 1976); *Hayes v. Hettinga*, Iowa, 228 N.W.2d 181, 182. However, we are not bound by trial court determinations of law. *Sand Seed Service, Inc. v. Bainbridge*, supra; *Whewell v. Dobson*, Iowa, 227 N.W.2d 115, 117.

II. Plaintiff first asserts the trial court erred by failing to find excuse for its failure to accept delivery on the corn contracts. It argues a shortage of railroad boxcars during the period in question made it temporarily impossible to accept delivery and that the doctrine of "commercial frustration" was applicable to excuse this nonacceptance.

■ The doctrine of impossibility of performance is recognized in Iowa as an excuse for nonperformance generally where that which has been promised becomes *objectively* impossible to perform due to no fault of the nonperforming party. However, ordinarily a contingency which reasonably may have been anticipated must be provided for by the terms of the contract, or else the impossibility of performance resulting therefrom does not operate as an excuse. *Salinger v. General Exchange Ins. Corp.*, 217 Iowa 560, 564, 250 N.W. 13, 15; *Mahaska County State Bank v. Brown*, 159 Iowa 577, 585, 141 N.W. 459, 462; 6 Corbin on Contracts, sections 1320, 1325. Where the impossibility is only temporary, the promisor's duty is only suspended while the impossibility continues. *Weiditschka v. Supreme Tent K. M. W.*, 188 Iowa 183, 170 N.W. 300; Restatement of Contracts, section 462; Simpson, Handbook on Contracts, 2nd Ed., section 179.

■ Because the subject of the contracts here in question is within the ambit of Article 2 of the Iowa Uniform Commercial Code, plaintiff was not required to prove impossibility in order to excuse per-

formance. The Commercial Code replaces the requirement of objective *impossibility* by a standard of *impracticability*. Sellers are excused for nonperformance "if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." Code section 554.2615(a). Comment 3 to this section in the Iowa Uniform Commercial Code clearly indicates that this less stringent test was consciously adopted to reflect the commercial character of modern business practice. While the section expressly mentions *sellers*, the explanations in Comment 9 make it evident the provisions should also be equally applicable to buyers. Thus the Code expressly recognizes the doctrine of "commercial frustration" which has been increasingly utilized as an additional excuse for nonperformance in certain instances. See, 6 Corbin on Contracts, section 1353; Restatement, Second, Contracts, Tentative Draft No. 9 (1974), sections 281 and 285.

■ Under the record there was insufficient evidence to show circumstances constituting an impossibility sufficient to excuse plaintiff's nonacceptance of the grain. The trial judge noted in his ruling there was evidence the elevator accepted grain from other farmers during the same period it refused to honor its contracts with defendant. Furthermore, whether, in fact, there was a shortage of boxcars throughout the period was not clearly shown. William Cole, Milwaukee Railroad representative, testified there were sufficient cars available until April 1973. This was over three months after plaintiff had first refused to accept delivery of defendant's corn.

■ There was also no showing of the commercial impracticability required to excuse performance under the Uniform Commercial Code. Arndt testified the elevator's contracts with Cargill required rail delivery. However, there was no such condition in the contracts with defendant. The fact delivery might be made by another method was thus not a failure of condition which would temporarily excuse delay in performance. See Comment 7, section 554.-2615.

■ We further note that Arndt made the damaging concession the elevator made no attempt to obtain any substitute method of carrier because this was too expensive. This admission undermines plaintiff's position in two different ways. First, the mere fact that performance becomes economically burdensome or unattractive does not excuse performance unless the increased cost is due to some unforeseen contingency which alters the essential nature of the performance. *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 7th Cir., 508 F.2d 283, 293–294; Comment 4, section 554.2615. Plaintiff did not show any increased cost would be so prohibitive as to change the nature of its corn contracts with defendant.

■ Additionally, there was no showing made that plaintiff even attempted to secure any substitute method of delivery as means of fulfilling the contracts. This failure is fatal to appellant's whole argument when read in light of section 554.2614(1). That section provides:

"Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted."

Thus even though plaintiff had originally expected to meet its obligations in a particular way it was obligated to attempt to secure an alternative means of performance. See *Chemetron Corp. v. McLouth Steel Corp.*, N.D.Ill., 381 F.Supp. 245, 257.

Since no impossibility or impracticability was shown to exist in this case, we find and hold there was no excuse for nonacceptance. Plaintiff was required to tender substitute performance. It may not now complain because of its failure to do so.

III. We next address plaintiff's contentions that defendant waived his right to rescind the contract by acquiescing in the

delay and later failed to properly retract the waiver prior to rescinding the contract.

Trial court in its order expressly found defendant had waived plaintiff's breach of contract by his course of performance. Thus the only issue we must decide is whether given a valid waiver, defendant properly retracted it prior to cancelling the contract.

As plaintiff correctly contends, section 554.2209(5) establishes the applicable law on this issue. It provides:

"A party who has made a waiver affecting an executory portion of the contract may retract the waiver by *reasonable notification* received by the other party that strict performance will be required of any term waived, *unless* the retraction would be *unjust in view of a material change* of position in reliance on the waiver." (Emphasis added).

Trial court found that defendant-farmer effectively retracted his waiver on August 20, 1973. There is sufficient evidence within the record to support this conclusion.

 Two questions then must be yet addressed: (1) was the notice of retraction reasonable? (2) was the retraction unjust in view that plaintiff-elevator materially changed its position in reliance on the waiver? The applicable answers turn on questions of fact not law. *Double-E Sportswear Corp. v. Girard Trust Bank*, 3 Cir., 488 F.2d 292.

The evidence is uncontradicted that defendant attempted to deliver corn to plaintiff-elevator on numerous occasions but was prevented from doing so. Furthermore there is evidence that as a result of this delay defendant's corn began to deteriorate badly in quality and its value was greatly reduced. Under these circumstances it does not appear defendant acted unreasonably in retracting the waiver and selling directly to the Orchard elevator without first notifying plaintiff.

Trial court additionally concluded that there was no substantial evidence showing the retraction was unjust since there was no material change of position in reliance on the waiver. We agree. Ted Arndt, Manager of the Nora Springs Elevator, testified that at the same time he was refusing to accept delivery of defendant Brandau's corn the elevator purchased and took into the elevator 698,000 bushels of corn. Also, there was evidence the elevator refused to secure additional storage facilities in order to accept defendant's grain.

Trial court properly determined defendant effectively retracted his waiver under section 554.2209(5).

IV. Plaintiff next contends the trial court erred by failing to find its breach of contract was too insubstantial to defeat the objects of the contract and thus cancellation was unavailable to defendant as a remedy.

Prefatorily we note section 554.2703(f) provides that where the buyer breaches the contract the aggrieved seller may "cancel." "Cancellation" occurs when either party puts an end to the contract for breach by the other. Section 554.2106(4). Nothing is mentioned about *materiality* of the breach as argued by plaintiff. Thus, when read together with section 554.1106 which mandates that remedies are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed," we might very well hold that materiality need not be shown to warrant cancellation of the corn contracts.

 However, even if, arguendo, materiality is a requirement for cancellation under the theory that the general principles of law merchant supplement the specific provisions of the Uniform Commercial Code, section 554.1103, plaintiff's contention is still unconvincing. In *Maytag Co. v. Alward*, 253 Iowa 455, 465, 466, 112 N.W.2d 654, 660 we held rescission is only permitted where the breach is so substantial as to defeat the object of the contracting parties. Whether a breach is material obviously depends on the factual circumstances but generally delay in acceptance of perishable goods is more likely to be found material than a delay in another type of contract. Simpson, Handbook on Contracts, 2nd Ed.,

**750**

section 163; *Bamberger Bros. v. Burrows*, 145 Iowa 441, 124 N.W. 333.

Trial court found defendant attempted to deliver corn several times but was prevented from doing so by Arndt. During this same time period it is undisputed the elevator accepted delivery of 698,000 bushels of grain from other farmers. Furthermore, there was evidence that as a result of plaintiff's unwarranted delay in acceptance, defendant's corn deteriorated and its value was reduced. Under these facts there is substantial evidence supporting trial court's determination that defendant's cancellation was fully justified by the elevator's delay in acceptance of delivery.

V. In its final assignment of error, plaintiff contends trial court erred by failing to apply section 554.1203 requirements of "good faith" to defendant's cancellation of the corn contracts.

 Section 554.1203 provides "every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." Good faith is defined as "honesty in fact in the conduct or transaction concerned." Section 554.-1201(19). Also see, *Farmers Co-op. El., Inc., Duncombe v. State Bank*, Iowa, 236 N.W.2d 674, 678. This basic principle runs throughout the Iowa Uniform Commercial Code.

The trial court expressly found defendant had acted in "good faith" in tendering delivery of corn on several occasions. However, the court did not discuss application of section 554.1203 to defendant seller's failure to definitely retract his waiver of plaintiff's delay before selling his grain to the Orchard elevator.

Under the facts as previously set forth, we believe there is sufficient evidence that any such notice would have been an exercise in futility. The contrast between defendant Brandau's conduct here and defendant Bainbridge's conduct in *Sand Seed Service, Inc. v. Bainbridge*, 246 N.W.2d 911 (filed November 17, 1976) is instructive. In that case there was a complete failure of evidence that defendant had ever tendered delivery of the corn prior to

his sale to another elevator. Here, the record is replete with evidence of defendant's repeated attempts to honor his contract obligations. Plaintiff's argument to the contrary is without merit. The elevator must reap the harvest of its unjustified treatment of defendant. The judgment of the lower court is affirmed.

AFFIRMED.