IOWA ELECTRIC LIGHT AND POWER
COMPANY, Plaintiff,

v.

ATLAS CORPORATION, Defendant.

No. C 77–16.

United States District Court,
N. D. Iowa,
Cedar Rapids Division.

Findings of Fact, Conclusions of Law
May 4, 1978.

Order Sept. 8, 1978.

John F. Gaston, William O. Gray, Keith Stapleton, Cedar Rapids, Iowa, Joel S. Wight, William J. Franklin, Washington, D. C., for plaintiff.

George M. Newcombe, Eric N. Vitaliano, Edgar M. Masinter, Michael Corrigan, New York City, Patrick M. Roby, Ralph W. Gearhart, Gary J. Streit, Tom M. Collins, Cedar Rapids, Iowa, for defendant.

## OPINION I

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

McMANUS, Chief Judge.

This matter was tried to the court January 16–17, 1978 on defendant's (Atlas') counterclaim for contract reformation increasing the per pound price of uranium concentrate ($U_3O_8$ or yellowcake). Post-trial briefs, arguments, proposed findings and motions having been received, the case is ready for decision.

In 1973 plaintiff (IE) and Atlas entered into a contract under which Atlas was to supply $U_3O_8$ [1] to IE for four years. During the life of the contract a number of factors combined to force up the price of $U_3O_8$. The price increase significantly altered the uranium producing industry's cost structure. Long-term supply contracts entered into prior to the serious price inflation became increasingly burdensome to producers.

After two late deliveries of yellowcake by Atlas, IE, a public utility, anticipating future delays, on March 22, 1977 filed its complaint seeking preliminary and permanent injunctions: (1) to prevent Atlas from selling or otherwise disposing of $U_3O_8$ held or controlled by defendant; (2) to insure that IE be given priority to any of Atlas' $U_3O_8$ necessary to fulfill its contractual agreement; and (3) to order Atlas to sell and deliver the $U_3O_8$ to IE. The complaint recited the instability of the $U_3O_8$ market as a further grounds for insecurity. In fact the market price of $U_3O_8$ rose about sevenfold between the period just prior to contracting and 1977. IE moved to insure itself uranium at the 1973 price which had become a bargain in 1977.

On April 11, 1977, prior to the scheduled preliminary injunction hearing, Atlas counterclaimed stating that unforeseen factors had resulted in drastic cost increases and burdensome losses [2] which excused performance and warranted price adjustment. In addition, Atlas claimed that conditions in the industry and its agreement to continue to supply $U_3O_8$ entitled it to an equitable adjustment of the contract price.[3]

1. Uranium ore is mined from open and underground mines. Generally ore contains small traces of uranium, thus requiring mills to be built near the mines to chemically extract uranium oxide, ($U_3O_8$, yellowcake) from the ore. In this process varying grades of ore are blended to maximize a mine's useful life. Atlas sells yellowcake to uranium users who further process the yellowcake into nuclear fuel. For a more complete background summary of the nature of the uranium supply industry, *see* Joskow, Commercial Impossibility, The Uranium Market and the Westinghouse Case 6 J. of Leg. Studies 119 (1977).

2. Testimony at trial and Atlas' exhibits indicate that Atlas lost $1,838,360.95 on its contract with IE in 1976 and projects losses of $4 million in fiscal years 1977–1979, not including corporate overhead, interest and profits. Tr. 95 and 149–150.

3. Letters of intent dated January 8, 1973 (Plaintiff's Ex. 812) and February 20, 1973 (Plaintiff's Ex. 813) addressed to Edward Farley, Atlas' president and board chairman, and signed by Duane Arnold, president and board chairman of IE, laid out the details of the subsequent contract entered into October 15, 1973. The

A hearing on the preliminary injunction was held in April, 1977 at which the parties stipulated that Atlas would continue to supply $U_3O_8$ pursuant to its contract through the year 1979 subject to such price increase, if any, as the court may determine after trial.[4] The court's order of April 18, 1977 stated:

> Upon such deliveries plaintiff shall pay to the defendant the contract price as provided in the contract between the parties, as amended, and plaintiff shall subsequently pay such further per pound amount, if any, as may be determined by this court on final trial of the merits.

After hearing the testimony, reviewing the voluminous exhibits and depositions and the law of commercial impracticability and equitable adjustment, it is determined that the existing contract continues to bind the parties. Although the court is sympathetic to the well-argued case supporting excuse and adjustment, it finds there is insufficient evidence to substantiate Atlas' bid for a judicial determination that its $17.40 cost of producing $U_3O_8$ is attributable to unforeseen and uncontrollable factors relating to market phenomena, governmental action and general inflation.

There is sufficient evidence in the record, offered by both parties, that certain production decisions were made in response to rising market prices for $U_3O_8$ and resulted in higher costs of production. The decision to develop the acid circuit for extracting $U_3O_8$ and vanadium was made prior to the 1973 contract. (Farley Tr. 114). In 1972, prior to final negotiation of this contract, Atlas was aware its alkaline ore reserves were nearly exhausted. (Dearth Tr. 56). The costs of the acid circuit were somewhat higher than those of the alkaline circuit (Dearth Tr. 66) though Mr. Farley testified that he was not sure that the final per pound costs of extracting uranium from acid ore were greater. (Tr. 115–116). In fact, the June, 1977 summary of treatment costs at Atlas' Moab, Utah mill indicate that acid circuit treatment costs were substantially greater per pound of $U_3O_8$ (about 25 per cent) than for the alkaline circuit. (Plaintiff's Ex. 95).

In addition, as market prices rose rapidly to unexpected highs,[5] it became economically feasible and prudent for producers to use lower grade ores to fulfill new contracts made at the new increased market price. The new market prices more than made up for the increased production costs stemming from treatment of ore blends with lower uranium concentrations. The metallurgical reports from the Moab mill indicate significant lowering of ore grade blends used in the alkaline circuit between June, 1973 and June, 1977.

■ There is no doubt that Atlas suffered burdensome increases in production costs. There is no doubt that many of those costs were not foreseen or considered likely to occur or to be so substantial. But Atlas has failed to bear its burden on the counter-

---

contract price per pound of $U_3O_8$ delivered in July of each year was:

| | | |
|---|---|---|
| 1. | 1975 | $7.10 |
| 2. | 1976 | $7.55 |
| 3. | 1977 | $8.00 |
| 4. | 1978 | $8.45 |

Paragraph 2(b) of the contract stated:

For each pound of $U_3O_8$ delivered after July 15 in each year set forth in paragraph 2(a) above and before July 1 in the following year, the applicable price per pound set forth in paragraph 2(a) shall be increased at a rate of 0.12329 cents per day, provided that, with respect to concentrates delivered after the applicable Schedule/Delivery Date established in accordance with paragraph 1 hereof, no price increase shall be applied after such date.

On January 26, 1976 the contract was amended to reflect a price increase of $1.25 per pound in exchange for an option under which IE could purchase 250,000 additional pounds of $U_3O_8$ in 1980 at the market price on the scheduled delivery date. (Defendant's Ex. EE). The amendment also provided for new delivery dates for the remaining $U_3O_8$ covered by the 1973 contract.

4. Under the contract, IE's sole remedy for nondelivery was to cancel the affected portion of the agreement, cover on the open market, and charge Atlas for the difference in costs. The consent order modified the contract to the extent that the right to demand cover was waived by Atlas.

5. The market price for yellowcake in 1978 rose to slightly more than $43.00. (Tr. 83).

claim to prove which and how much of the increases were reasonably unforeseen and not, in part, a function of its own actions.[6] A contract is not a sacred document. But the stability and efficiency of economic life is said to be closely linked to the integrity of these commercial agreements.

"Impracticable" as used in UCC § 2–615 does not mean impossible and each situation should be viewed in the context of reasonable commercial relationships. *See Nora Springs Cooperative Co. v. Brandau,* 247 N.W.2d 744, 747–748 (Iowa 1976); *Henszey,* UCC Section 2–615—Does "Impracticable" Mean Impossible?, 10 UCCLJ 107 (1977). However, Atlas must show that the increase is more than onerous or expensive and that it had no part in stimulating that increase. *Eastern Air Lines, Inc. v. Gulf Oil Corporation,* 415 F.Supp. 429, 438 (S.D.Fla.1975). The burden of proving each element of impracticability is on the party claiming excuse. Id.; *Cf. Ocean Air Tradeways, Inc. v. Arkay Realty Corp.,* 480 F.2d 1112, 1117 (9th Cir. 1973). Here Atlas has failed that proof.

### Rostermundt's Testimony and Evidence

The record is inconclusive as to the impacts of internal corporate and external inflationary stimuli on $U_3O_8$ production costs. For example, in a letter addressed to Duane Arnold on January 15, 1976, Edward Farley, noting a change in ore grades, stated that this "lower grade translates into a 39% direct cost increase".

Iowa Electric's expert witness, Leo Rostermundt, testified that he believed internal decisions accounted for at least 25 per cent of Atlas' total production cost and about half of the total increased costs claimed by Atlas. Though the court will admit Rostermundt's testimony and IE's exhibits 934 and 934–1, objected to at trial

and subject to a motion to strike, it gives them little weight. The actual calculations seem too speculative to serve as a basis for this decision. In fact, in his deposition taken November 21, 1977, Mr. Rostermundt stated that in order to calculate the cost per pound of $U_3O_8$ he would have to know "all the things [he] needed to know to do an audit. . . ." (Dep. 89). He offered the same answer when asked "If you were just to satisfy yourself personally that you could calculate the cost per pound of $U_3O_8$, what would you need to have?" Neither he nor his firm had performed an audit on Atlas. He based his calculations on corporate records and the audit of Atlas' independent auditor, Cooper & Lybrand.

Mr. Rostermundt's testimony as to certain accounting principles aided the court generally in understanding production costs in the uranium industry. "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions". 3 Weinstein's Evidence ¶ 702[01], at 702–9 (1976). No such factors exist here.

### Iowa Code § 554.2615

In relevant part IC § 554.2615 (hereafter referred to as § 2–615) adopts the following language from the 1962 Official Text of the Uniform Commercial Code (UCC):

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-oc-

---

**6.** The promiser is not discharged from his contractual duty if he himself wilfully brought about the occurrence which he claims prevents performance. 6 Corbin on Contracts § 1329 (1964). Corbin would distinguish between the burden of proof and the burden of going forward with evidence. 6 Corbin on Contracts § 1329 (1964). Regardless which approach is

applied here, Atlas has failed to prove its case. Under a burden of proof theory it has failed in its burden to prove its own actions did not cause the increased costs or any part of them. Under a burden of going forward, once evidence was offered that Atlas' actions resulted in higher costs, Atlas failed to rebut or quantify those costs.

currence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

It is noted that the official comments stress that the test of "commercial impracticability" must be distinguished from the common law tests of "impossibility" and "frustration of performance" in order to call attention to the commercial character of the article. Official Comments 1–3.[7]

■ Three elements must be proven before excuse becomes available under § 2–615: (1) the seller must not have assumed the risk of some unknown contingency; (2) the non-occurrence of the contingency must have been a basic assumption underlying the contract; and (3) the occurrence of that contingency must have made performance commercially impracticable.

The contract between the parties does not specifically allocate the risk of the occurrence of the types of unforeseen contingencies which Atlas claims in the aggregate make this contract impracticable. It does make Atlas liable for costs due to delivery of uranium which does not meet contract specifications. Atlas also accepts title and risk of loss until delivered to IE's conversion plant. Paragraph 7 of the contract provides for cover with Atlas liable for the difference between cover price and contract price and any penalties imposed on IE by the conversion plant operator for failure or delay in delivery. Excuse is granted under paragraph 8 for the occurrence of a "force majeure".

■ Where the risk of substantially increased costs is not allocated by the contract, § 2–615 comes into play and the court looks to the foreseeability of the conditions claimed as a basis for excuse and the nature of the burden to determine if the occurrence or occurrences make performance commercially impracticable. See Mishara Construction Co., Inc. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 310 N.E.2d 363 (1974).

*Foreseeability*

In *Nora Springs, supra,* the Iowa Supreme Court noted that excuse may be available where "increased cost is due to some unforeseen contingency which alters the performance". 247 N.W.2d at 748, *citing Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 293–294 (7th Cir. 1974). Before reaching the question of impracticability then, the court must consider whether the non-occurrence of contingencies complained of were at the heart of the contract, that is, were they foreseeable.

■ Atlas claims that the Arab oil embargo and OPEC cartel, unexpected federal environmental and occupational safety regulations, inordinate inflation of wages and chemical and equipment costs, and certain uranium market conditions (mainly the announcement that Westinghouse could not fulfill its contractual commitments to supply about 70 million pounds of yellowcake) combined to make performing the IE contract commercially impracticable. While some of these phenomena may have been

7. Judge Skelly Wright emphasized the difference between commercial impracticability and physical impossibility in *Transatlantic Financing Corporation v. United States,* 124 U.S.App. D.C. 183, 186, 363 F.2d 312, 315 (1966) when he wrote:

> The doctrine ultimately represents the evershifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance.

The doctrine of impracticability has been narrowly construed. Although proponents of liberal interpretation point to *Mineral Park Land Co. v. Howard,* 172 Cal. 289, 156 P. 458, 460 (1916) for the proposition that excessive and unreasonable cost can excuse performance, few courts have excused performance on that theory alone. See *Transatlantic Financing Corporation v. United States, supra* n.14 and text at 190 of 124 U.S.App.D.C., at 319 of 363 F.2d.

However the magnitude and impact of drastic cost increases in the modern commercial context may call for a liberalization of the way courts read § 2–615 where performance makes little commercial *sense* and there is adequate proof of actual costs brought about by the unforeseen contingency.

unforeseen, and certainly the total impact was not contemplated by either party during contract negotiations, the evidence in this case shows that prior to the contract being signed there was good reason to anticipate rising costs and drastically increased expenditures for environmental and safety equipment and procedures. *See* Plaintiff's Exhibits 303, 324 (37 Fed. Register No. 13). During the days when uranium producers were hanging on in a buyer's market there were signs that eventually yellowcake production would become profitable, not because of lower production costs, but due to increased demand and prices. (Plaintiff's Exhibit 393 (Wall Street Journal, Nov. 14, 1972)). *See Joskow*, Commercial Impossibility, The Uranium Market and the Westinghouse Case, 6 J. of Leg. Studies 119, 136–137 n. 16 and text (1977).

It would be unfair to expect Atlas to have prophesied the magnitude of the increases complained of, but it is not clear that it was not in a position to protect itself contractually from some of the risks which would drive the price of yellowcake up and consequently affect the cost of production.

Testimony at trial also indicates that Atlas needed a long-term supply contract to strengthen its position in obtaining corporate financing. Thus, it entered into the IE contract with hopes of marginal profits but warnings that it might lose money. (Plaintiff's Exhibit 425).

*Impracticability*

■ Where the occurrences complained of are in some degree foreseeable and capable of being protected against contractually, where the burdensome production cost in-crease complained of is to some extent a function of internal corporate decisions, and where it is impossible to determine what share of the increase is attributable to unforeseen conditions not assignable to the party seeking discharge or adjustment, it becomes unnecessary to reach the question of how much increase constitutes impracticability. In fact failure of proof stymies any attempt this court could make toward adjustment under § 2–615.

*Equitable Adjustment—IC § 554.2716(2)* [8]

IE sought and obtained specific performance from this court which ordered Atlas to continue delivering $U_3O_8$ under the contract. Atlas correctly notes that IC § 554.-2716 (§ 2–716) liberalizes the common law concept of specific performance, and the language of the section and nature of the consent order would allow this court to equitably adjust the price of the disputed $U_3O_8$. The problem facing the court is determining an equitable price for the $U_3O_8$. As discussed above, Atlas has failed to establish the amount of increase in the cost of producing $U_3O_8$ caused by factors beyond its control and pre-contract contemplation. Absent sufficient proof of an amount which would institute an equitable adjustment, this court cannot pick a price out of the air. The $17.40 price Atlas seeks is partially a function of Atlas' internal, profit-maximizing decisionmaking process. As such it cannot be the basis for this court to reform the contract's price element.

*Equitable Adjustment—IC § 554.2209* [9]

As noted above in the discussion of § 2–716, equity may require some adjust-

---

**8.** IC § 554.2716 (1965) states the buyer's rights to specific performance and implies that specific performance may be accompanied by price adjustment. In relevant part it states:

(1) Specific performance may be decreed where the goods are unique or in other proper circumstances.

(2) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

**9.** In relevant part IC § 554.2209 (1965) provides for modification, rescission and waiver in the following terms:

(1) An agreement modifying a contract within this Article needs no consideration to be binding.

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

ment of price. Section 554.2209 (§ 2–209) of the Iowa Code provides for modification of contract. Official Comment 2 states in relevant part:

The test of "good faith" between merchants or as against merchants includes "observance of reasonable commercial standards of fair dealing in the trade" (Section 2–103), and may in some situations require an objectively demonstrable reason for seeking modification. But such matters as a market shift which makes performance come to involve a loss may provide such a reason even though there is no such unforeseen difficulty as would make out a legal excuse from performance under Sections 2–615 and 2–616.

■ This comment might support a more liberal modification theory than does § 2–615. But again, Atlas fails in its proof of what constitutes an equitable adjustment. There is no doubt that the parties have entered into the modification included in the consent order in good faith (at least the good faith of horse traders), however the court cannot on this record develop a reasonable adjusted price.

*Summary*

This is a difficult case. A number of factors have coalesced to turn what might have been perceived as a profitable deal into a disaster. Not adjusting the price here should not be read as barring recovery under any of the theories pressed by Atlas where the proof is sufficient to allow judicial intervention. The court takes note of the number of voluntary price adjustments entered into by other suppliers and buyers of yellowcake. Voluntary attempts at reaching equitable agreements and foregoing expensive litigation should be encouraged.

(3) . . .

(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

(5) A party who has made a waiver affecting an executory portion of the contract may

For purposes of analyzing this case under any of the espoused theories, the contract should normally stand alone, i. e. corporate financial condition should be irrelevant. However, the relationship of this contract with more recent ones entered into by Atlas at higher market prices leads the court to the conclusion that disaster was at least partly attributable to the type of prudent business decisions which point to substantial long-term profits for Atlas Corporation's Minerals Division. *See* Defendant's Exhibit MF.

*Findings of Fact*

1. IE is a corporation organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa and is engaged as a public utility in supplying electricity to consumers.

2. Atlas is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey and through its Minerals Division, is engaged in the production and sale of uranium concentrate ($U_3O_8$, yellowcake).

3. Atlas, from 1968 until 1975 processed only uranium ore in an alkaline circuit.

4. Prior to 1973 Atlas knew its reserves of alkaline ores were rapidly becoming exhausted.

5. In 1972 and 1973 Atlas discovered and purchased significant reserves of uranium-vanadium ores in areas near its Moab, Utah mill.

6. Prior to 1972 Atlas had planned to rebuild an acid circuit to process uranium-vanadium ores.

7. For several years prior to 1972, the price of uranium was artificially low and capital for expansion was in short supply.

8. Atlas, confident that the uranium market would expand, entered into negotia-

retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

tions with IE to supply yellowcake for the years 1975 through 1978 and a contract was signed October 15, 1973.

9. The contract contained a constant escalation factor of 3¾ cents ($0.0375) per pound per month to cover inflation and costs of environmental and safety requirements. The contract provided for shipment of approximately 700,000 pounds of yellowcake at a base price of $7.10 per pound escalating to $8.45 per pound in 1978.

10. Atlas officials believed they would realize profits from the contract, but were informed by their accountants that a contract similar to that negotiated with Iowa Electric might incur losses.

11. Relying partially on the contract, Atlas obtained substantial financing to expand and renovate its uranium operations.

12. Pushed by a number of factors, the price of yellowcake increased from $5.95 to $43.00 per pound between 1972 and 1977.

13. Some of these factors were foreseeable by Atlas. The rapidly rising price had the effect of spurring competitive bidding for ores, driving that price up, and allowed producers to mill lower grades of ore, extending the life of the ore supplies. Treatment of lower grade ores increased the per pound cost of production of yellowcake. Thus, at least some of the production cost increase is attributable to Atlas' own actions in responding to market forces.

14. As production costs rose beyond the price levels in Atlas' 1973 contract, Atlas notified IE of the problem and requested an adjustment. Some of the correspondence between Atlas and IE was informational, requiring no response though business etiquette may have dictated otherwise.

15. An amendment to the 1973 contract was signed on January 26, 1976 increasing the price of yellowcake by $1.25 per pound and changing the scheduled delivery dates to extend into 1979. IE received an option to purchase an additional 250,000 pounds of uranium in 1980 at the then market price.

16. Subsequent communications by Atlas requesting new adjustments repeatedly met with silence.

17. Post amendment deliveries in 1976 were repeatedly late.

18. Acknowledgments to communications from IE to Atlas concerning late deliveries were late and unresponsive.

19. Negotiations regarding delivery and price adjustment faltered in early 1977 and this suit was commenced March 22, 1977.

20. Both parties have attempted to maximize their business positions by hard-headed, but good faith bargaining.

21. Atlas, though a profitable corporation, sustained losses on this contract.

### Conclusions of Law

1. This court has jurisdiction of the parties and subject matter.

2. Atlas has failed to prove by a preponderance of the evidence that it is entitled to equitable contract reformation increasing the price of yellowcake supplied IE above that specified in the contract as amended.[10]

IT IS ADJUDGED

Atlas' counterclaim dismissed.

### OPINION II

This matter is before the court on defendant's resisted motions to alter or amend this court's May 4, 1978 findings of fact and judgment under FRCP 52(b) and 60(b) and in the alternative to reopen the record for clarification and for new evidence under FRCP 59(a). The court finds that it is not necessary to reopen the record but that defendant's motion to alter and amend should be granted. However, the judgment for plaintiff must stand.

This case was tried to the court January 16–17, 1978. On May 4, 1978 decision was rendered in favor of plaintiff, Iowa Electric

---

10. It has failed to prove that the increases resulted from actions beyond its control and that the contingencies which occurred were not foreseeable at the time of contracting. Both elements are required for relief under § 2-615.

Neither is equitable adjustment under § 2–209 or § 2–716 available where the party seeking to be excused does not establish the amount of claimed production cost increases caused by events beyond its control.

Light and Power Company (IE) on defendant Atlas Corporation's (Atlas') counterclaim, denying defendant an upward adjudgment of its contractual selling price under three theories embodied in separate sections of Iowa's Uniform Commercial Code—§§ 554.2615, 554.2716(2) and 554.-2209, (§§ 2 615, 2 716, 2 209). Basically the court held that defendant failed to prove by a preponderance of the evidence the critical element in determining any equitable adjustment—that increased costs of production were not attributable to its own profit-maximizing decisions or contingencies which it could have foreseen and protected against.

Now defendant moves for reconsideration of the voluminous record and has reorganized its exhibits to comply with the court's standard of proof. Fairness demands reconsideration in light of the substantial legal and equitable issues involved. Now that defendant presents a clearer picture of its cost structure, it is possible to consider whether defendant carries its burden to prove commercial impracticability.[1]

Defendant has reorganized certain evidence taken at trial of this case in an attempt to satisfy its burden to show that continued performance of its contract with IE is "commercially impracticable" under § 2–615 as a result of unforeseen events to which Atlas did not contribute. Defendant also would have the court apply §§ 2–716 and 2–209 to the facts and equitably adjust the contract price of $U_3O_8$ (yellowcake) sold IE.

## §§ 2–716 and 2–209

Defendant argues that the court's May 4, 1978 holding favors adjustment under these sections of the Iowa Uniform Commercial Code. That inference was mistakenly supported by language in the original decision. The court takes this opportunity to clarify its position.

■■■ Initially it is noted that specific performance under § 2–716 is a buyer's remedy. Defendant points to paragraph 2 to support its theory that a court may adjust the price in favor of seller to balance the equities of specific performance. That section has never been so construed. Nor does its language lend itself to that interpretation. Section 2–716(2) states:

> The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

The language appears to deal with terms of payment, i. e., time, place, manner, not with judicial adjustment of the actual contractual price term. In fact Official Comment 4 of the Uniform Commercial Code states:

> This section is intended to give the buyer rights to the goods comparable to the seller's rights to the price.

This court will not adjust price based on this section.

■■ Similarly defendant asserts that § 2–209 provides a basis for adjustment. It does not. Defendant argues that by entering into a consent decree with plaintiff under which it would continue to perform its contractual obligations, it modified the contract by waiving its right to cease performance and forcing IE to cover—the only

---

1. IC 554.2615 provides in relevant part:

   Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
   (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) *is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made* or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid. (emphasis added).

   The court has already found that at least part of defendant's contractual losses resulted from the occurrence of a contingency whose nonoccurrence was an underlying assumption of the contract and which was not contemplated by the parties, the risk of which was not allocated among the parties. *See also Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429, 438 (S.D.Fla.1975).

remedy provided in the contract. The consent decree provided for voluntary performance subject to the court's ultimate determination of the amount to be paid by plaintiff to defendant. The consent order however did not give defendant a right to price adjustment, particularly not under § 2–209. That section contemplates modification emanating from "good faith" bargaining between merchants. § 2–209, Comment 2. It does not undertake to give the court a role in imposing an adjustment. As plaintiff states, it sets standards for a court to determine whether a voluntary waiver of a contract provision is enforceable and whether that waiver is reasonably withdrawn. *See* Anderson's Uniform Commercial Code § 2–209; *Double-E Sportswear Corp. v. Girard Trust Bank*, 488 F.2d 292 (3d Cir. 1973); *Nora Spring Co-op Co. v. Brandau*, 247 N.W.2d 744, 749 (Iowa 1976). No court-imposed adjustment is available under this section.

In its order of May 4, 1978 the court mistakenly indicated equitable adjustment was possible under § 2–716. That statement is amended by this order. The court did not specifically consider the merits of defendant's § 2–209 claim but held only that the proof of what constituted an equitable price was insufficient. This order constitutes the court's holding as to the applicability of §§ 2–716 and 2–209.

The above discussion makes it clear that if defendant is to prevail, it must carry the burden on its § 2–615 claims.

### Commercial Impracticability

As noted above, the court's May 4, 1978 decision was grounded on defendant's failure to prove the amount of cost increase above the contract price attributable to unforeseen sources and not to defendant's own business decisions. Now defendant has come forward with a request that the court review the already admitted evidence in an attempt to compute an equitable cost.

Three elements must be proven before excuse or adjustment becomes available under § 2–615: (1) the seller must not have assumed the risk of some unknown contingency; (2) the nonoccurrence of the contingency must have been a basic assumption underlying the contract; and (3) the occurrence of that contingency must have made performance commercially impracticable. It has already been determined that the risk was not contractually allocated. *See* Opinion I *supra*. The court must now reconsider element 2 and if satisfied that the proof is sufficient as to non-foreseeable factors and not attributable to defendant's actions, it will then consider the question of impracticability, excuse and adjustment.

### Time Period

Defendant argues that costs should be computed for the life of the contract as amended on January 26, 1976. The original contract called for deliveries in 1975–1978. The amendment deferred deliveries into 1979. Plaintiff complains that defendant should not benefit from cost increases after 1978 since it knew at the time of amendment that its cost increases were "substantial". (Tr. 86). The court agrees that deferral should not benefit defendant. Any adjustment must be based on cost increases incurred during the 1976–1978 period. Under the amended contract nine deliveries totalling 568,750 pounds of $U_3O_8$ were scheduled for that period at an average cost per pound of $9.0036 for a total cost to IE of $5,120,766.66. Any determination of impracticability and adjustment must be based on these figures.[2]

Defendant now offers an analytical structure for determining its costs which were not foreseeable or a function of its own actions. It has adjusted for decreased ore grade and environmental expenditures using dates and figures most favorable to plaintiff and has arrived at a new cost figure of $14.27 per pound of $U_3O_8$. This

2. Even if the court computed Altas' losses on the basis of the amended contract, the loss would not constitute commercial impracticability. Assuming Atlas' cost to be $14.27 per pound of $U_3O_8$ (the cost most favorable to defendant), the loss on the contract for the full 728,750 pounds would be about $3,672,900.00, less than 55 percent.

cost represents a 58.4 percent increase over the contract price and loss over the contractual period of approximately $3,097,312.00.

Plaintiff criticizes these figures for failing to include adjustments for: (1) depreciation due to ore grade reduction, (2) ore grade decline during the entire contractual period, and (3) exploration and general administration costs. Plaintiff's computation of adjusted cost is $13.44 per pound of $U_3O_8$, or an increase of approximately 50 percent over contract. Using these figures defendant's net loss for the original contractual period is about $2,525,250.00.

■ The court's computation of adjusted costs includes additional depreciation due to reduced ore grade ($.31 per pound of $U_3O_8$) and ore grade differential for the full contractual period ($.26 per pound of $U_3O_8$) and rejects additional general costs and those for exploration and administration which cannot be firmly attributed to defendant's decision to reduce ore grade. Cost then is $13.70 per pound of $U_3O_8$ for an increase over contract of 52.2 percent and a loss of about $2,673,125.00.

■ Using any of these figures, Atlas is not entitled to discharge or adjustment under § 2–615. The absolute losses and percentage of increase do not warrant so drastic a remedy for a bad deal. This is especially so in the present instance because Atlas was in the best position to protect itself from the vagaries of the marketplace and is obviously at least as able to bear the risk as IE. In fact, Atlas has successfully spread the risk of its losses through highly profitable contracts subsequent to the one at issue. In *Transatlantic Financing Corporation v. United States*, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966) the court refused to excuse the shipper from performing its contract to transport wheat from a United States Gulf port to a safe port in Iran after the Egyptians closed the Suez Canal during an armed international crisis in late 1956. Judge Wright stated:

> Transatlantic was no less able than the United States to purchase insurance to cover the contingency's occurrence. If anything, it is more reasonable to expect owner-operators of vessels to insure against the hazards of war. They are in the best position to calculate the cost of performance by alternative routes (and therefore to estimate the amount of insurance required), and are undoubtedly sensitive to international trouble which uniquely affect the demand for and cost of their services.

363 F.2d at 319.

While rampant inflation may not have been as foreseeable as war in the Middle East, Atlas was in a better position to measure its impact on the uranium industry. Although the increased cost of production seriously altered Atlas' expectations with respect to the contract at bar, by taking advantage of the inflated market prices and profit margins in new contracts, it effectively spread its risk among other buyers.

In addition, increases of 50–58 percent generally have not been recognized as a basis for excusing or adjusting contractual obligations. *See e. g., Ocean Transp. Tankers Corp. v. V/O Sovfracht (The Eugenia)*, [1964] 2 Q. B. 226, 233; *Tsakiroglou & Co., Ltd. v. Noblee Thorl G.m.b.H* [1960] 2 Q. B. 348 Note 4; *Schafer v. Sunset Packing Co.*, 474 P.2d 529, 530 (Or.1970); § 2–615 Official Comment 4. These British precedents have been cited favorably and followed in *Transatlantic Financing Corp., supra*, and *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975). The mere fact that performance has become economically onerous is not sufficient to excuse performance. *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293 (7th Cir. 1974); *United States v. Wegematic Corp.*, 360 F.2d 674, 677 (2d Cir. 1966).

### Costs of Acid and Alkaline Circuits

Defendant asserts that the court's May 4, 1978 finding that acid circuit treatment costs per pound of $U_3O_8$ were higher than alkaline circuit costs is erroneous. Its exhibit, set out in Appendix B, would support that assertion. However, other cost summaries found in plaintiff's trial exhibits 94

and 95 indicate that the acid circuit treatment costs were higher. Therefore the original finding is clearly not erroneous and will stand. At any rate, the finding, even if erroneous, is not determinative of any critical element in this case, and though relevant, was not necessary to the court's holding. *See American Ins. Co. v. Lucas*, 38 F.Supp. 926, 939–956 (W.D.Mo.1941) *appeals dismissed* 314 U.S. 575, 62 S.Ct. 107, 86 L.Ed. 466, *cert. denied* 317 U.S. 712, 63 S.Ct. 433, 87 L.Ed. 567; *cf. Vennell v. United States*, 38 F.Supp. 381, 382 (E.D.Pa.1941), *affirmed* 122 F.2d 936 (3d Cir. 1941).

This order constitutes additional and amended findings of fact and conclusions of law which together with the May 4, 1978 order, findings and conclusions, constitute the final judgment of this court.

It is therefore

ORDERED

1. Judgment amended and supplemented consistent herewith.

2. Counterclaim dismissed.