**POWER ENGINEERING & MANUFACTURING, LTD., An Iowa Corporation, Appellee,**

v.

**KRUG INTERNATIONAL, Appellant.**

**No. 91–1737.**

Supreme Court of Iowa.

June 16, 1993.

Eric W. Johnson and Hugh M. Field of Beecher, Rathert, Roberts, Field, Fister, Walker & Morris, Waterloo, for appellant.

Larry J. Cohrt of Swisher & Cohrt, Waterloo, and Charles T. Mattson, Waterloo, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ, and LAVORATO, JJ.

HARRIS, Justice.

An Iowa manufacturer contracted to design and supply special equipment for a corporation doing business in Ohio. Although the Iowa manufacturer was unaware of it, the equipment was to be sold to an entity in Iraq. As a result of hostilities between that nation and ours, an embargo was declared and enforced, prohibiting trade with the entity in Iraq. The question in this suit is which of the two corporations must bear the loss. The trial court determined that it is the responsibility of the corporation in Ohio, not the Iowa corporation. We agree.

The dispute is between Power Engineering & Manufacturing, Ltd. (Power Engineering) and Krug International (Krug). Power Engineering is an Iowa corporation engaged in the business of engineering and manufacturing heavy-duty gear boxes and transmissions. Its principal place of busi-

ness is in Waterloo. Krug is a non-Iowa corporation that manufactures and supplies equipment. Its principal place of business is in Dayton, Ohio. Power Engineering brought this action against Krug for breach of contract, seeking money damages.

The contract arose from a commercial relationship between Tripod Laing, an international joint venture, and Iraqi Airways. Tripod Laing was to deliver to Iraqi Airways, in Iraq, an aeromedical equipment laboratory, one part of which was to be a human centrifuge, equipment used to train jet pilots. Tripod Laing contracted with Krug International (U.K.), Ltd., a subsidiary of Krug, to build the aeromedical equipment laboratory. The Krug subsidiary then contracted with Krug to build the centrifuge. Krug in turn contracted with Power Engineering to build a gear box to be used as a part of the centrifuge. Power Engineering did not know the identity of Krug's buyer or the identity of the ultimate consumer until it received a stop work order in August of 1990.

The relationship between Krug and Power Engineering was established through both oral negotiation and an exchange of written forms: a meeting in early March 1990; Power Engineering's "QUOTATION," dated March 14; Krug's "PURCHASE ORDER," dated March 16; and Power Engineering's "PURCHASE ORDER ACKNOWLEDGMENT," dated April 26. Power Engineering began manufacturing the gear box shortly after receiving the purchase order.

There never was a clear meeting of minds on whether the order was subject to cancellation. Throughout the transaction the parties somewhat casually communicated divergent positions on written forms. Power Engineering's quotation stated "ONLY NON–CANCELLABLE ORDERS ACCEPTED." Power Engineering's purchase order acknowledgment contains similar language. Power Engineering nevertheless concedes:

> There had been discussions, however, during a meeting between the parties in the first week of March, wherein Krug

had expressed the desire to be able to cancel the order if necessary and pay for what work had been completed as of the cancellation date. Power Engineering had agreed to do so thus overriding the printed language of the form.

The purchase order states on its front, "KRUG has the right to cancel this order at any time and will pay for only work completed." Power Engineering points out that this "language was consistent with the verbal understanding of the parties [concerning] the amount of damages to which Power Engineering would be entitled [upon cancellation or delivery deferral]."

So far, the parties and the language on the forms appear to be in agreement. But on the reverse side of Krug's purchase order appears a "force majeure" clause. Power Engineering asserts it was neither discussed between the parties nor agreed upon. This clause—the central point of the dispute—provides as follows:

> 10. **Contingencies.** *In the event of causes beyond the control of Purchaser,* including but not limited to acts of God, fire, the elements, strikes or labor disputes, and accident or transportation difficulties *which would make it unreasonable in Purchaser's judgment to accept delivery hereunder, Purchaser shall have the option to terminate this purchase order* or to delay the delivery or completion of all or part of the items, such termination or delay being *without cost to Purchaser.*

(Emphasis added.) Krug correctly asserts that Power Engineering never, either verbally or in the purchase order acknowledgment, discussed or objected to this clause.

It appears that Power Engineering initially received merely an oral purchase order and an electronic facsimile of only the front page of the written purchase order, and began production at that time. Power Engineering did not receive a copy of the complete purchase order until a month later, on April 16, 1990. Thus Power Engineering could not become aware that Krug had incorporated a "force majeure" clause on the reverse side of the purchase order until it received the complete copy. This

was after it had begun the manufacturing process.

During the initial manufacturing and assembly stages, Krug paid Power Engineering $75,000, just over one-half of the $149,700 contract price. The gear box was completed in late July, and a minor adjustment requested by Krug was completed in early August. On August 7 Krug authorized Power Engineering to ship the gear box. It was not shipped immediately only because of some routine matters that already had been, or were soon, resolved.

Hostilities with Iraq, known as the Gulf War, began on or about August 6, 1990. The United Nations immediately implemented an embargo against all shipment of any materials to Iraq. Reacting to the embargo, on August 7 Tripod Laing directed Krug International (U.K.), Ltd., by letter to "carry out no more work and expend no more money until further notice." In the letter Tripod Laing alleged "that due to the United Nations resolution ... we have been forced to suspend operations on the contract due to 'force majeure'." Krug received a copy of this letter on August 7 and immediately complied with its directive. Believing the gear box was in transit, however, Krug decided all equipment in transit would be accepted and paid for. On August 10 Krug learned that Power Engineering had not yet shipped the gear box and immediately orally directed Power Engineering not to ship it. On August 13 Power Engineering received a similar written directive from Krug. Krug purported to be operating in accordance with the force majeure clause. The gear box remains in storage because Krug has refused to have it shipped.

Power Engineering then brought this suit. The district court determined the force majeure clause is not part of the contract between the parties. The court found that Power Engineering had fully complied with the contract and Krug had breached it. Judgment was entered for

Power Engineering against Krug for one-half the purchase price—plus interest and costs.

■■■ I. The case was tried to the court at law so our review is for correction of errors. Iowa R.App.P. 4. The findings of fact in jury-waived cases have the effect of a special verdict. Iowa R.App.P. 4. They are binding on appeal if supported by substantial evidence. Iowa R.App.P. 14(f)(1). We are not bound by the trial court's application of legal principles or conclusions of law. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). The intent of the parties is the controlling factor in the construction of written contracts; except in the case of ambiguity, the intent of the parties is determined by the language of the contract itself. Iowa R.App.P. 14(f)(14).

Finally, "a contract will not be interpreted [as] giving discretion to [a] party in a manner which would put one party at the mercy of another, unless the contract clearly requires such an interpretation." *Iowa Fuel & Minerals*, 471 N.W.2d at 863.

■■ II. Our question, though potentially difficult to answer, is itself simple: is the force majeure clause part of the contract between the parties? The answer to this question lies in Iowa Code section 554.2207 (1991)[1] which provides:

1. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

1. Article 2 of the Uniform Commercial Code applies. *See* Iowa Code §§ 554.2102 ("this Article applies to transactions in goods ..."), .2105(1) ("*Goods*' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale....").

a. the offer expressly limits acceptance to the terms of the offer;

b. they materially alter it; or

c. notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

3. Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

We think the force majeure clause never became a part of the contract. A clause in Power Engineering's quotation—the initial form exchanged by the parties—provides that "[n]o waiver, alteration, or modification of the provisions [of the quotation] shall be binding on [Power Engineering] unless agreed to in writing . . . ." This restrictive language may be read two ways, neither of which calls for inclusion of the force majeure clause in the contract. The language can be read to mean either: (1) "I agree to contract only if your acceptance contains all of my terms and I hereby object to any additional terms"; or (2) "[t]his offer can be accepted only by a document that contains neither additional nor different terms." White & Summers, Uniform Commercial Code § 1–2, at 33 (2d ed. 1980).

Under the first reading Krug's purchase order serves as an acceptance of Power Engineering's quotation under Iowa Code section 554.2207(1), and the force majeure clause is merely a proposed additional term. But the proposed term is excluded from the contract under sections 554.-2207(2)(a) and (c). The quotation's "no waiver, alteration or modification" clause operates as the required notification of objection to the force majeure clause under section 554.2207(2)(c). *Id.*

Under the second reading no contract exists at the conclusion of the exchange of forms because the force majeure clause is an additional or different term. Thus there has been no acceptance under section 554.-2207(1). *Id.* at 33–34. Contract formation can nevertheless still occur under section 554.2207(3). *Id.* at 34. The parties' conduct was sufficient to establish a contract under section 554.2207(3), but the writings of the parties clearly do not agree regarding the incorporation of the force majeure clause. Accordingly, under that section the force majeure clause is not a part of the contract between the parties. The district court was correct in so holding.

■ III. Krug argues in the alternative that, if the force majeure clause is not a part of the contract, or does not control for any other reason, Iowa Code section 554.-2615 (excuse by failure of presupposed conditions) mandates a finding that Krug did not breach the contract by terminating it. Section 554.2615 is the uniform commercial code's version of the common law theories of impossibility and commercial impracticability. It provides in part:

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

a. Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs "b" and "c" is not a breach of the seller's duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

Under section 554.2615(a) a buyer [2] wishing to escape from liability for nonperformance must make a three-pronged showing:

(1) Its performance has become commercially impracticable,

---

**2.** Although § 554.2615 expressly mentions sellers only, we have said it equally applies to

buyers. *Nora Springs Coop. Co. v. Brandau,* 247 N.W.2d 744, 748 (Iowa 1976).

 

(2) By either

    (a) the occurrence of an unforeseen contingency the nonoccurrence of which was a basic assumption on which the contract was made,[3] or

    (b) compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid,[4] and

(3) It had not assumed the risk of the contingency or governmental regulation.[5]

We think the theory has no application here. In the first place Krug's performance cannot truly be said to be commercially impracticable. *See Nora Springs,* 247 N.W.2d at 748 ("the mere fact that performance becomes economically burdensome or unattractive does not excuse performance unless the increased cost is due to some unforeseen contingency which alters the essential nature of the performance"). The embargo does not prevent Krug from fulfilling its contractual obligations with Power Engineering. Although the embargo prevents products from being shipped to Iraq, it does not prohibit a domestic purchaser from buying, from a domestic manufacturer, a machinery component part intended for shipment there.

We do not believe that the stop order further up the chain of contracts in this case constitutes an "occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." Although Krug may have made assumptions regarding such unforeseen contingencies, Power Engineering was not privy to Krug's planned use of the gear box. Under the circumstances Krug must be found to have assumed the risk that its purchaser would not, or could not, perform.

**AFFIRMED.**

---

**3.** U.C.C. comment 1 to Iowa Code § 554.2615 states that the section "excuses a seller from timely delivery of goods contracted for, where [its] performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting."

**4.** "If performance is rendered impracticable by a governmental regulation or order, the [buyer] is freed from [its] obligation without reference to the language of 2–615 concerning contingency and basic assumption." White & Summers § 3–9, at 128.

**5.** In addition to § 554.2615's introductory remarks, U.C.C. comment 8 provides that "[t]he provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting. . . ."