OPINION NO. II
STAPLETON, District Judge:
Prior to 1970, commercial activity in the United States relied upon the availability of cheap and plentiful energy. Abundant oil replaced abundant coal as the primary energy source for heat, electricity and industrial production. Later, nuclear energy promised a limitless supply and lower costs for the future. Those who entered long term contracts in the 1960’s did so with expectations shaped by this background. For those whose contract performance was energy dependent, the reality of the 1970’s departed substantially from those expectations. This case involves a contract executed in 1965, a thirty-five year lease of space in an office building in Wilmington, Delaware. Occupancy began in 1967, when the price of a barrel of oil on the international market was $1.50. The lease will expire in 2002.
I. BACKGROUND.
Freidco of Wilmington, Ltd. (“FW”) a limited partnership, was created for the purpose of developing land in downtown Wilmington as a site for a new headquarters office building for the Farmers Bank of Delaware (“Farmers”). The entire transaction between FW as developer and manager of the building, Farmers as primary tenant, and creditor, and the General Electric Pension Fund as the assignee of Farmers’ rents, titleholder, and lessor to FW under a long term ground lease, is complex and need not be recited here.[1] The issues addressed in this Opinion require me to consider only the terms of the lease between Farmers and FW.
Farmers and FW’s predecessor in interest signed the lease on May 14, 1965. Under its terms, Farmers rents approximately 79,800 square feet of space on the basement through the sixth floor of the Farmers Bank Building (“FBB”). Farmers’ space comprises roughly 40% of the leasable area of the building. It pays a rental of $4.31 per square foot. Farmers also pays its proportionate share of property tax increases, and the “actual costs charged to FW for water, electricity and heating and air conditioning furnished or used on the premises, provided, however, that the annual cost to Tenant therefore shall not exceed $1.10 per square foot of occupied space.” (Lease, ¶ 10.3, X-1025). In 1979, the last year for which we have facts of record, Farmers paid $344,121 in rent; $27,150 in property taxes; and $90,489 for its pro rata share of utility costs.
In this litigation, FW’s Trustee in Bankruptcy asks that the $1.10 limitation, or “cap”, on Farmers’ obligation to reimburse FW for utility service be set aside as commercially impracticable in view of the dramatic increase in the cost of that service. Farmers insists that the utility provision is not impracticable and has counterclaimed for alleged overpayments to FW for utilities between 1967 and 1974. This Opinion comprises the Court’s Findings of Fact and Conclusions of Law.
II. THE COMMERCIAL IMPRACTICABILITY CLAIM.
A. The Legal Standards
In recent years, courts have abandoned the restrictive doctrine of “impossibility of performance” for the more flexible “impracticability” standard, see Annot., 93 A.L. R.3d 584 (1979); Hawkland, The Energy Crises and Section 2-615 of the Uniform *819 Commercial Code, 79 Comm.L.J. 75 (1974). In keeping with its general emphasis on commercial reasonableness, the U.C.C. provides:
2-615 Excuse by Failure of Presupposed Conditions
Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) [referring to partial performance and notice to buyer] is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made. . . .
Likewise, the Restatement (Second) of Contracts (1981) (hereinafter cited as Restatement (2d)) excuses non-performance
[w]here, after a contract is made, a party’s performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . unless the language or the circumstances indicate the contrary.
Restatement (2d), § 261, Discharge by Supervening Impracticability.
Delaware has enacted Section 2-615 of the U.C.C., 6 Del.C. § 2-615 (55 Del.Law c. 349), which in turn served as a model for the Restatement. Although the U.C.C. does not govern this case, I conclude that the Delaware Supreme Court would be likely to follow the rule of the U.C.C. and the Restatement to resolve this dispute.[2] Accordingly, I will apply that standard.
Discharge by reason of impracticability requires proof of three elements. First, the party claiming discharge must establish the occurrence of an event the non-occurrence of which was a basic assumption of the contract. The event need not be unexpected, unforeseeable, or even unforeseen. Restatement (2d) § 261, Comment c; § 265, Comment a. Transatlantic Financing Corp. v. United States, 363 F.2d 312, 318 (D.C.Cir.1966). The non-occurrence of that event, however, must have been a fundamental assumption on which both parties made the contract. “The continuation of existing market conditions and the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule stated in [Section 261].” Restatement (2d) § 261, Comment b.
Second, it must be shown that continued performance is not commercially practicable. Although the standard of impracticability is not impossibility, neither is it mere impracticality. Restatement (2d) § 261, Comment d. “A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials or costs of construction, unless well beyond the normal range, does not amount to impracticability since this is the sort of risk that a fixed price contract is intended to cover.” Id. As the Third Circuit Court of Appeals recently explained in Gulf Oil Co. v. FPC:
The crucial question in applying [the doctrine of commercial impracticability] to any given situation is whether the cost of performance has in fact become so excessive and unreasonable that failure to excuse performance would result in grave injustice. . . .
* * * * * *
The party seeking to excuse [its] performance must not only show that [it] can perform only at a loss but also that the loss will be especially severe and unreasonable.
563 F.2d 588 at 599-600.
Finally, the party claiming discharge must show that it did not expressly or impliedly agree to perform in spite of impracticability that would otherwise justify his *820 nonperformance. Both the U.C.C. and the Restatement provide that contracting parties may override or control the application of the “discharge by supervening impracticability” rule if they agree to do so. Thus, a court in a case of alleged commercial impracticability must examine the agreement of the parties and the circumstances surrounding their negotiations in order to determine if they contemplated that the commercial risk involved would be borne by the party claiming discharge, despite the impracticability of performance. If so, he is not excused and may be held liable for damages. Restatement (2d) § 261, Comment c.
B. The Utility Cap As An Unconditional Undertaking
I turn initially to the third element of the commercial impracticability claim in this case because it poses a substantial issue which, if resolved in Farmers’ favor, would be dispositive. See Gulf Oil Corp. v. FPC, supra.
The parties to the 1965 lease did not ignore the possibility of changing utility costs. The price which Farmers was to pay for the utility service supplied by FW was to vary with changes in the rate paid by FW for that utility service until that rate reached the $1.10/sq. ft. cap. The lease thus assigned the burden of any increase in utility rates below that cap to Farmers. Further, the cap itself was an assignment of a potential burden from increased utility costs; it allocated the risk of increases above the $1.10/sq. ft. to FW.
The risk allocation inherent in the utility cap does not require, however, that FW be left with the burden of all increased costs above $1.10. The doctrine of commercial impracticability assumes contractual allocation of a burden to the party claiming discharge and operates to relieve a party who has assumed a duty without expressly qualifying that undertaking to exclude the changed circumstances. Restatement (2d) § 261, Comment a. Accordingly, the focus cannot be on the unqualified nature of the language of the contract. Rather, the inquiry is whether the parties, by virtue of their implicit assumptions, have contracted in a universe more limited than the literal undertaking, or whether they intended to allocate a duty without regard to the possibility of change, foreseeable or otherwise.
A fixed price contract for the manufacture and delivery of goods, in effect, assigns the risk of increased costs to the seller. Courts enforce that assignment in the context of increased costs within the normal range. The existence of such a risk assignment does not preclude a discharge by supervening impracticability, however, where a disaster results in an abrupt tenfold increase in cost to the seller. Restatement (2d), Introductory Note at 311. In such a circumstance, the seller may be relieved of his duty because the contract, having been made on a different “basic assumption”, is regarded as not covering the extreme case that has arisen. As the Restatement puts it, it “is an omitted case, falling within a ‘gap’ in the contract.” Id.
In a case in which the parties have allocated the risks associated with increasing costs at a variety of levels, it is, of course, less likely, than in the fixed price case, that the risk at a particular level was beyond the universe in which the parties contracted. Nevertheless, contracting parties may allocate the risks at levels which they recognize as being realistic possibilities during the term of the contract without assigning risks that are wholly unforeseeable at the time of their negotiations or which are so remote at that time as to be deemed unworthy of express treatment. Or, stated in the context of this case where the estimated utility cost during negotiations was $.52/sq. ft., the fact that the parties allocated the burden associated with a 111% increase does not mean, for example, that they allocated the burden of a tenfold increase. If the latter burden was a wholly unforeseeable one at the inception of the term or was so remote as to be of minimal importance, this would suggest that non-occurrence of such a burden was a “basic assumption” within the meaning of the Restatement. See Restatement (2d), Introductory Note at 311.
*821 This is not a case in which a party has expressly undertaken to assume all risks, known or unknown, associated with a particular kind of change of circumstance. It is thus unlike the Gulf case where the court found that Gulf, by “warranting, rather than merely promising, the availability of sufficient quantities of gas [to meet the purchaser’s needs] . . ., assumed for itself the entire risk that future conditions would ...” require it to transport the gas over a long distance at substantial additional expense. 563 F.2d at 599.[3]
Having concluded that the utility cap itself does not preclude relief, I turn to an analysis of the other two elements.
C. The Basic Assumptions
As the comments to the Restatement and the U.C.C. point out, the parties to any contract to be performed over a term normally assume that the cost of performance may fluctuate during the term, and, as a result, courts ordinarily do not conclude that an increase in the cost of performance is an event the non-occurrence of which was a basic assumption of the contract. In addition, in this ease we know from the terms of the contract itself that the parties in fact assumed that the cost of FW’s performance of the utility provisions might vary over a range the high end of which would be greater than $1.10.
The Trustee argues that the rise of utility rates at their current levels is an event the non-occurrence of which was a basic assumption of the contract because (1) rates at that level during the contract term were not foreseeable in 1965, (2) the parties negotiated against the background a study which estimated the utility operating costs at about $.50/sq. ft. and made no mention of future increases, and (3) the utilities cap provision was not the subject of extensive negotiation and was apparently not considered by the parties to be of major significance. While I accept the factual predicates for this argument, it does not persuade me that any event has yet occurred which was not within the universe of circumstances in which the parties sought to allocate risks.
It is true that a person seeking in 1965 to forecast utility rates over the ensuing thirty-five year period would be highly unlikely to have predicted what has in fact happened.
Earl D. Krapf, Vice President for Regulatory Practice for Delmarva, testified at length and with considerable first hand knowledge regarding the history of utility costs in this area. He indicated, with respect to the cost of electricity, that “[u]ntil 1970 there had not been a revenue or rate increase in New Castle County for at least fifty years, . . . and that, during that time, there was a consistent decrease in cost per kilowatt hour of electric service.” (Tr. G— 9). With respect to the cost of gas, Krapf pointed out that, except for extremely minor adjustments having no bearing on a building operation such as the FBB, there had been no price increases between 1948 and September 1970. (Tr. G-46-^47).
Allan J. Schultz, a consulting engineer specializing in engineering economies with many years of experience in utility rate matters, testified concerning certain findings published in the 1965 National Power Survey (X — 2116) the most comprehensive study made of the electric utility industry up to that time. Among other analyses, projections, and conclusions, that report found that “[t]he average retail price for electricity is expected to decline 27% by 1980, $1.68 per kilowatt hour in 1962 to $1.23 in 1980, assuming no further price inflation.” (Tr. H-95). Schultz knew of no forecasts or predictions in 1964 which were *822 contrary to that made by the National Power Study. (Tr. H-96, 103).
F. Gerard Adams, a professor of economics at the University of Pennsylvania, confirmed Schultz’s view of what one would expect of future utility cost behavior based on the best available information in 1965. Regarding the foreseeability of utility costs viewed from the mid~1960’s, Professor Adams testified:
Well, at the time of 1964, we were witnessing a decline in petroleum prices. We were anticipating that decline would continue, and that would reduce costs for utilities. Moreover, we have a fairly long history of gains in productivity of the other utilities, so that we could foresee, as we were back in ’64, even a continuation of declining utility costs. Certainly no reason to anticipate that they would rise.
Hi H¡ * * * H«
[Q] Can you say whether in 1964 a person knowledge in the workings of the petroleum industry had any basis for anticipating the prices — the price increases which occurred in the 70’s?
A. No, I don’t believe so. I consider myself knowledgeable in this field now and was certainly knowledgeable in the field then. . And I recall that we watched with some fascination as to the competition in the petroleum industry grew . . . None of these were events [OPEC cartel etc.] that any reasonable expert would have foreseen back in 1964.
(Tr. 1-86-87).
A chart based on the price index for electric power as used in the Wharton data bank, likewise, showed an absolutely flat curve from the early 1950’s to the late 1960’s. (X-2122, Chart 1). The Wharton data bank index for gas prices showed a similar flat curve until the late 1960’s but with a “very slight tendency to rise over the period from ’54 through the early ’60’s.” (Tr. 1-98). A trend projection in 1964 based upon that data “would show a modest rate of growth” so that in the year 2000 the price of gas would have doubled. “That’s the way I think it would have looked in ’64.” (Tr. 1-99).
The Trustee is also correct in observing that the sparse evidence regarding the subjective state of mind of the parties in 1965 does not suggest that they believed that utility rates would rise as sharply as they have. (Tr. 1-23-24; Morris Dep. 7-8). Farmers commissioned a real estate development expert, Landauer Associates of New York, to do a construction and operating cost analysis before the project was undertaken. (X-3033a). The Landauer Report estimated utility cost at $.49-.52/sq. ft. and contained no suggestion that significant increases were in the offing. The Landauer Report was made available to FW and it is reasonable to infer that its subjective expectations were consistent with the cost estimates of that Report.
Finally, the evidence relating to the inclusion of the utility cap also suggests that the parties expected, at most, a gradual rise in utility rates over the term of the lease. While the record does not disclose how the concept of a utility cap originated, it does reflect that this provision was not regarded as a matter of major importance in the negotiating process. (Tr. 1-10; A — 45-46).
Regardless, however, of what the parties and others thought would be the most likely course of events with respect to utility rates, FW and Farmers recognized the possibility of utility costs in excess of $1.10/sq. ft. during the term of the lease and expressly assigned the burden of costs above that level to FW. During 1979, the last year for which figures are in the record, the cost to FW for the utility service supplied to Farmers was $1.43/sq. ft.[4] Ac *823 cordingly, the relevant issue, I believe, is whether it can be said that the non-existence of a situation producing utility costs of $1.43 is a basic assumption of a lease which assigns such costs above $1.10 to the landlord. To state the question is to answer it.[5] While there is undoubtedly a level of utility cost beyond the universe in which these parties contracted, one would have to ignore the utility cap provision itself to conclude that that level had been reached at the time of trial.[6]
D. Impracticability
My conclusion that there has been no event the non-occurrence of which was a basic assumption of the contract, provides a sufficient basis for denying to FW the relief which it seeks. I write further, however, because other issues have been tried and briefed by the parties which should be before the Court in the event of an appeal of this case and which may play some role in possible subsequent litigation over the utility cap provision.
 There are two preliminary questions which need to be addressed before
considering whether FW has established that its performance has become impracticable. The first relates to the context in which impracticability of performance is to be judged. Farmers argues that the “only relevant issue is whether [FW’s] . . . continuing with its ownership interests in the Building would be commercially impracticable.” (Farmers’ Answering Br. at 15). In my view, however, neither that standard nor the practicability of a sale of FW’s interest in the building, a standard sometimes urged by FW, is appropriate. The appropriate standard is whether FW’s performance of its obligations under the lease between the parties has been rendered commercially impracticable. This is a narrower standard than ones which would factor in FW’s relationships with other tenants, FW’s relationship with Farmers under other agreements, and alternative real estate investment opportunities currently available in the area. It is, at the same time, a broader standard than one which would limit consideration solely to the operation of the utility cap. As the Third Circuit Court of Appeals pointed out in the Gulf Oil case, a dramatic increase in gas transportation cost will not justify a discharge if the sup *824 plier is nevertheless not experiencing a significant out-of-pocket loss on the contract.[7]
The second preliminary issue relates to the time at which the alleged impracticability is to be evaluated. I conclude that the Trustee must demonstrate that its performance under the terms of the lease is presently impracticable. This is important in this case because both parties[8] forecast utility rate levels before the end of the lease term which go far beyond the universe in which the parties allocated the risk of changed circumstances and which, if they come to pass, are likely to render FW’s performance impracticable at that time. Discharge, or alteration of contractual obligations is an extraordinary remedy, however, and is not justified absent a showing of the occurrence of an event which has in fact rendered performance commercially impracticable.
This is not to say that economic forecasts are irrelevant in commercial impracticability cases. What the commercial world foresees for the future may well have a present impact on the practicability of a particular performance and, if so, that present impact must be taken into account. In this case, however, the Trustee has not demonstrated that the anticipated higher cost of utilities in the future has made it commercially impracticable for it to perform its lease obligations at the present time.
Turning to the issue of impracticability itself, the record reveals that the utility cap provision has resulted in FW’s paying $23,544 in utility expenses for Farmers’ space in 1979 which was not reimbursed by Farmers. This represents 5.14% of the total consideration received from Farmers under the lease in that year. It is not altogether clear from the record whether or not this 5% reduction in revenue resulted in a negative cash flow in 1979. The Trustee asserts that it did; Farmers argues to the contrary. Even if the record as a whole suggested that FW performed its lease obligations at a loss in 1979, however, I would remain unpersuaded that the loss has been, in the words of the Gulf opinion, “so excessive and unreasonable that the failure to excuse performance would result in grave injustice.” 563 F.2d at 588.
The Trustee’s commercial impracticability claim will be denied.[9]
III. THE UTILITY OVERCHARGE CLAIM.
In 1967, when the Farmers Bank Building opened, William Morris, the President of FW’s general partner, agreed with Harry Carey, Farmers’ property management officer, that Farmers would begin paying $1.00 per square foot for utilities. On July 17, 1969, FW raised the billing rate to $1.05 per square foot, retroactive to January 1st of that year. On June 1, 1971, the billing rate reached the $1.10 ceiling, and has remained at that level ever since. FW’s recorded utility expenses were less than the amount *825 billed throughout this period, however, and did not reach the $1.10 level until June 1, 1974. Farmers asserts a claim for the difference between what it paid and what was due under the provisions of Section 10.3 of the lease.
The Trustee’s first defense to this overcharge claim is that the parties orally amended Section 10.3 to provide that Farmers would pay the amounts in fact billed. The record does not support this contention, however. The lease provided that it could be amended only in writing. (X-1025, Art. 23). While under Delaware law an agreement containing such a provision may be orally amended, the existence of an agreement calling for formal amendments is circumstantial evidence tending to show that informal amendments did not occur. Pepsi-Cola Bottling Co. of Asbury Pk. v. Pepsico, Inc., 297 A.2d 28 (Del.1972). There is, however, far stronger evidence for this conclusion here. While there is evidence of an agreement between Morris and Carey that the first bill, when the actual costs were unknown, would be at the rate of $1.00/sq. ft., the wording of all of the communications between the parties prior to 1974 is consistent with Section 10.3 and inconsistent with the alleged oral amendments. When the billing rate went from $1.00 to $1.05 in 1969 and again when it went from $1.05 to $1.10 in 1971, the FW invoices explained that it was due to the “increased cost of utilities.”
The Trustee’s second defense is one of limitations. It is agreed that any claim for overcharges paid prior to September 8,1972 is barred unless the record provides some basis for tolling the statute.[10] Fraudulent concealment is alleged, but once again the record does not provide the necessary factual predicate.
As Justice (then Chancellor) Duffy has written:
Where there has been fraudulent concealment from a plaintiff, the statute [of limitations] is suspended only until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. Giordano v. Czerwinski, Del.Supr., 216 A.2d 874 (1966). Fraudulent concealment requires that something affirmative be done by a defendant, some “actual artifice” which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trial of inquiry. . . .
Halpern v. Barran, 313 A.2d 139, 143 (Del. Ch.1973).
Based on the sparse record developed on this issue, I am unpersuaded that FW realized that any billings other than the first were not based on actual utility charges, that FW did any affirmative act to conceal the utility charges, or that Farmers exercised reasonable diligence in protecting its own interests.
Finally, the Trustee challenges the amount of the overpayment claim on the ground that Farmers’ “proportionate share” of the actual costs under Section 10.3 depends upon the extent of occupancy in the building from time to time. Throughout the term of the lease, however, the parties have regarded Farmers’ share as its share of the occupiable space in the building and this is the most reasonable construction of the terms of the lease.
IV. CONCLUSION.
For the reasons stated, FW will not be excused from performing its obligations under the utility cap provision of the Farmers’ lease. FW will be required to repay excess utility charges accruing after September 8, 1972.

. See my previous opinion in this case, dismissing an action against Farmers under the Bank Holding Company Act, 499 F.Supp. 995 (D.Del. 1980).

. The parties have not submitted any Delaware cases decided under the commercial impracticability standard, nor has the Court discovered any on its own. The parties agree on the standard, however, although not on its application to the facts.

. Nor is this case like Aluminum Co. of America (“ALCOA”) v. Essex Group, Inc., 499 F.Supp. 53 (W.D.Pa.1980). The parties there had agreed upon a formula which provided a sliding scale for the price of the goods to be sold over a potentially infinite range of cost increases. It is far easier to argue in that context that the parties have expressly allocated the burden associated with all theoretically conceivable price changes, even those not reasonably foreseeable at the inception of the bargain. Even in that situation, however, the court concluded that an unforeseeable rise in the seller’s non-labor production costs imposed a burden outside the scope of the contract.

. The Trustee contends that the correct figure is $1.65/sq. ft. While acceptance of that figure would not change the conclusion which I reach, I reject the reading of Section 10.3 of the lease which provides the foundation for the Trustee’s figure. Farmers’ $1.43 figure includes its share of the amounts billed to FW for the water, sewer, electricity, and gas necessary to provide water, sewer, light, heat and air conditioning service to the building. The Trustee’s figure includes these amounts as well as the cost of maintaining the heating and air conditioning *823 systems (e.g. expenses resulting from HVAC maintenance and service contracts with Carrier and the Honeywell “Boss” system which conserves heating energy). Section 10.1 contains two covenants: the landlord “shall maintain facilities to provide air conditioning and heating for the building” and the landlord “agrees to furnish or cause to be furnished, heat and air cooling to the premises as may be required for the comfort and occupation of the premises.” Section 10.2 requires the landlord to supply water and electricity “suitable for the intended purposes of the premises.” It is in this context that Section 10.3 requires the tenant, below the cap, to pay “its proportionate share of the actual costs charged to the Landlord for water, electricity, and heating and air conditioning furnished or used on the premises.” I read the phrase “heating and air conditioning furnished or used” to refer back to the landlord’s commitment “to furnish or cause to be furnished, heat and air cooling” and not to its obligation to “maintain facilities.” This is consistent with the more general obligation of the landlord to “keep and maintain the building and its ... systems and facilities ... in good working order, condition and repair.” Section 9.2.

. See American Trading and Production Corp. v. Shell International Marina, Ltd., 453 F.2d 939 (2d Cir. 1972) (no relief for increase of less than one-third); Iowa Electric Light & Power v. Atlas Corp., 467 F.Supp. 129, 140 (N.D. Iowa 1979) rev’d on other grounds 603 F.2d 1301 (8th Cir. 1979) (no relief for increases less than 50%); Publicker Industries, Inc. v. Union Carbide Corp., 17 U.C.C.Rep.S. 989, 992 (E.D.Pa. 1975) (no relief for increase less than 100%).

. The increase in per square foot utility costs is substantially less than the increase in utility rates because there has been a significant reduction in consumption resulting from conservation efforts. I do not consider this fact to be of significance in the present analysis, however. To the extent that these conservation efforts have been undertaken by FW, they are consistent with its duty to mitigate increased costs of performance by a cheaper or more efficient substitute performance. See Restatement (2d) § 261, Comment d.

. On the other hand, while an alleged commercial impracticability attributable to increase cost of performance must be evaluated in terms of the contract as a whole, there must, of course, be a causal connection between the “event” and the impracticability. Thus, a relatively minor impact from the event, for example, will not operate as a discharge if the impracticability is attributable to another burden expressly assumed by the plaintiff in the contract.

. Farmers estimated per square foot costs at $13 in the final year of the lease. (X-1868). The Trustee’s estimates are lower, $11.75 or $8.14, using a straight line extrapolation of current prices and a Wharton data bank projection, respectively. (Tr. 1-82, 92-93, X-2122).

. I agree with the Trustee that, had commercial impracticability been shown, the “reformation” remedy he seeks would be a relief alternative open to the Court. Restatement (2d), Contracts, § 272; ALCOA v. Essex Group, supra, 499 F.Supp. at 78. Discharge by reason by impracticability like the doctrine of mistake, involves a state of mind presumed by the parties which is not in fact the case. “Mutual mistake” generally applies to a mistake concerning the true state of affairs at the time of the contract, while impracticability involves a mistaken conjecture about supervening events. In both cases reformation serves the purpose of filling a gap in the parties’ agreement. See Restatement (2d) § 204, Supplying an Omitted Essential Term; § 158; Collins v. Burke, 418 A.2d 999 (Del. 1980).

. 10 Del.C. § 8106.