The **PILLSBURY COMPANY,** Appellant,

v.

Richard **WARD,** Appellee.

No. 2–57539.

Supreme Court of Iowa.

Feb. 16, 1977.

Kenneth E. Wright and Ronald H. Rothert, of Goodenow & Wright, Maquoketa, for appellant.

J. R. Sokol, of Sokol & Sokol, Maquoketa, for appellee.

Submitted to MOORE, C. J., and MASON, UHLENHOPP, HARRIS and McCORMICK, JJ.

HARRIS, Justice.

Plaintiff grain dealer appeals an adverse judgment in a law action it brought against a farmer. The farmer had contracted to raise and deliver soybeans to the grain dealer. We affirm the trial court.

The facts are hotly disputed. Taking the evidence in the light most favorable to the findings of the trial court the controlling material facts are established as follows.

Richard Ward (Ward) selected what proved to be an inopportune year for his first venture into the futures market. On March 10, 1972 Ward agreed in writing to sell the Pillsbury Company (Pillsbury) 3000 bushels of soybeans at $3.06 per bushel. Ward intended to raise the soybeans during the ensuing crop year and agreed to deliver them during January 1973.

Ward's 1972 soybean crop came to only 2000 bushels leaving him 1000 bushels short. To make up the shortage he faced the necessity of buying 1000 bushels at the market price prevailing upon delivery.

Ward's predicament was compounded by a prodigious rise in the market price of soybeans. This rise obviously rendered Ward's contractual obligations decreasingly attractive to him. It also rendered his responsibilities for the 1000 bushels he lacked increasingly onerous. Correspondingly, the rise made Pillsbury's contractual rights increasingly attractive.

Pillsbury acted through its agent Del Aden who was employed by Pillsbury in Davenport as a grain merchandiser. Dale Bullock, an independent trucker, had a close and continuing relationship with both Ward and Pillsbury. Bullock was a friend and neighbor of Ward and regularly contracted to haul Ward's crops to market. Bullock also hauled grain for various other local farmers to Pillsbury's facility in Davenport on a regular basis. Daily, Bullock called Pillsbury to learn the prevailing grain prices and delivery conditions.

On January 25, 1973 Ward contacted Bullock in order to make delivery. Ward then made the necessary preparations for loading the soybeans from his bin into Bullock's truck.

For reasons which related more to Bullock's interests than to Ward's, Bullock called Aden at the Pillsbury facility before loading the soybeans for delivery. Weather and hauling conditions were generally unfavorable. Bullock was advised the trucks arriving with grain at the facility were lined up, causing delay before they could be unloaded. At trial Aden conceded he knew at the time Bullock was having " * * * trouble getting grain delivered in because he had wet fields to bring them out of, and the weather was bad, so—and he was having trouble in the truck lines that were around."

Without consulting Ward, Aden and Bullock agreed to "extend" the contract and await more favorable delivery conditions. Except for the possibility of spoilage, the extension would do little harm to Ward as to the 2000 bushels ready for delivery. But,

in view of the continuing rise in the soybean market, the delay would obviously require Ward to pay an increasing amount for the 1000 bushels he was short.

On January 27, 1973 Aden called Ward and announced that in a routine audit of contracts he noticed Ward had not delivered the beans and inquired what he intended to do. Ward testified he then told Aden "Dale Bullock called you last night and told you that we was going to bring these beans in, and you told him that you was filled up, and you couldn't take them." Ward testified Aden replied "Yeah, that's right. We're all filled up here and we're going to have to extend this contract into February. * * *."

Upon inquiry Aden reminded Ward he would have to pay the difference between the contract price and market price for any soybeans he was short. Aden then stated he would send an extension agreement to Ward. Ward did not respond to Aden's statement, neither agreeing to sign the extension agreement nor announcing he would refuse to sign it.

The extension agreement was never signed. Ward never made delivery under the contract. On February 6, 1973 Ward advised Pillsbury in writing he considered the contract void on the ground he offered to deliver the soybeans within the specified time and delivery was refused by Pillsbury. Ward later sold 1500 bushels (500 bushels were spoiled and not fit for sale) for $8.72 per bushel.

I. The first question is whether the agreement between Pillsbury and Bullock to extend the delivery date of Ward's soybeans was binding on Ward. To determine this question consideration must be given the following: (1) in connection with the extension agreement was Bullock an agent of Ward? (2) even if Bullock was not such an agent of Ward did Ward ratify the extension agreement? (3) even if Bullock was not such an agent of Ward and did not ratify the extension agreement was Ward estopped from denying the extension agreement?

■ *Was Bullock an agent of Ward for purposes of the extension agreement?* The question of whether a principal-agent relationship exists is ordinarily one of fact. *Walnut Hills Farms v. Farmers Co-op, Etc.,* 244 N.W.2d 778, 781 (Iowa 1976); *Pay-N-Taket, Inc. v. Crooks,* 259 Iowa 719, 724, 145 N.W.2d 621, 624 (1966); *Reed v. Bunger,* 255 Iowa 322, 329, 122 N.W.2d 290, 295 (1963). The trial court found Bullock was, for the purposes of the extension agreement, an agent of Pillsbury and not of Ward. Findings of fact by the trial court have the effect of a special verdict and are binding on us if supported by substantial evidence. Evidence is construed in the light most favorable to the judgment. In case of ambiguity the evidence is construed to uphold rather than defeat the judgment of the trial court. Rule 344(f)(1), Rules of Civil Procedure; *Nora Springs Co-op Co. v. Brandau,* 247 N.W.2d 744, 747 (Iowa 1976); *Sand Seed Service, Inc. v. Bainbridge,* 246 N.W.2d 911, 912 (Iowa 1976).

■■ The record reveals ample evidence to support the trial court's finding Bullock was not an agent of Ward, especially in view of the established elements of agency. Agency has been defined as a fiduciary relationship which results from (1) manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control and, (2) consent by the latter to so act. *Dailey v. Holiday Distributing Corp.,* 260 Iowa 859, 867, 151 N.W.2d 477, 483 (1967) and authorities. See also *Walnut Hills Farms,* supra, 244 N.W.2d at 780–781. There is substantial evidence Bullock was not acting in Ward's behalf in negotiating the extension, was not subject to Ward's control, and had not consented to be Ward's agent for the purpose of negotiating the extension agreement.

*Did Ward nevertheless ratify the extension agreement?* Pillsbury argues Ward ratified the extension agreement by failing to repudiate it in his phone conversation with Aden. Pillsbury relies on the rule:

" * * * [I]t is the duty of the principal to repudiate the unauthorized act of his

agent within a reasonable time after knowledge of the act of the agent comes to him. If he does not repudiate, the principal is held to have ratified. * * * (Authorities)." *Miller v. Chatsworth Sav. Bank,* 203 Iowa 411, 413, 212 N.W. 722, 724 (1967). See also *Abodeely v. Cavras,* 221 N.W.2d 494, 503 (Iowa 1974).

Ratification is defined in the Restatement, Second, Agency, § 82 as follows:

"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." See *Shannon v. Gaar,* 234 Iowa 1360, 1362, 15 N.W.2d 257, 258 (1944).

Affirmance is defined in the Restatement, Second, Agency, § 83 as follows:

"Affirmance is either

"(a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or

"(b) conduct by him justifiable only if there were such an election."

But it is clear ratification does not apply where, as here, the act is done by one who is not an agent or does not purport to be one. Restatement, Second, Agency, § 85 states:

"Purporting to Act as Agent as a Requisite for Ratification

"(1) Ratification does not result from the affirmance of a transaction with a third person unless the one acting purported to be acting for the ratifier.

"(2) An act of service not involving a transaction with a third person is subject to ratification if, but only if, the one doing the act intends or purports to perform it as the servant of another."

In the instant case Bullock did not act as agent for Ward in the transaction. The trial court so found and we have pointed out substantial evidence supports the finding. The record is void of any indication Bullock purported to act for Ward in connection with the extension agreement. On the contrary, the record is clear Bullock was acting in his own behalf and to the elevator's advantage in negotiating the extension agreement.

■ Even if we were to assume Bullock had been Ward's agent, Ward did not ratify Bullock's unauthorized act. To ratify an unauthorized act of an agent the principal must have full knowledge of the facts (actual or inferred) and must intend to ratify (expressly or impliedly). A failure to repudiate the unauthorized act of an agent within a reasonable time after learning thereof will be deemed a ratification. The receipt or retention of benefits from the unauthorized transaction may constitute ratification. *Abodeely,* supra, 221 N.W.2d at 502–503 and authorities.

■ Under these principles we do not believe Ward can be said to have ratified the extension agreement. The trial court expressly discredited Aden's testimony. Aden was the only person who testified Pillsbury would have accepted timely delivery and of Ward's knowledge of such willingness. Other testimony in the record supports Ward's claim he believed Pillsbury was unable to accept timely delivery and such inability was the reason for the extension agreement. Hence there is substantial evidence to support a holding Ward lacked full knowledge concerning the extension agreement. Ward cannot be said to have ratified the extension.

■ *Was Ward nevertheless estopped from denying the extension agreement?* Equitable estoppel proceeds from the premise that one who has made certain representations should not thereafter be permitted to change his position to the prejudice of one who has relied thereon. The principle is resorted to when injustice would otherwise result. *In re Estate of McAllister,* 214 N.W.2d 142, 146 (Iowa 1974). See also *Manson State Bank v. Diamond,* 227 N.W.2d 195, 201–202 (Iowa 1975). The burden of proving estoppel is on the party asserting it; strict proof of all elements is demanded. *Iowa Movers and Warehousemen's Ass'n v. Briggs,* 237 N.W.2d 759, 764

(Iowa 1976). On this record Pillsbury failed to carry its burden of proving equitable estoppel.

Pillsbury asserts it was misled by Ward's silence on the extension agreement. But Ward's silence, under the circumstances, should not have led or misled Pillsbury to any belief. This was not a situation in which silence indicated any willingness on Ward's part. Ward was given no option as to the extension but was told the papers would be sent because Pillsbury could not then accept delivery. Ward was not then told Pillsbury could or would accept timely delivery if he refused to sign the papers. Ward was not even told the extension was for Bullock's benefit. On the basis of what Aden knew and what Ward knew neither Aden nor Ward could have believed Ward was called upon to say anything. 28 Am. Jur.2d Estoppel and Waiver, § 53, pp. 665–671; 31 C.J.S. Estoppel § 87, pp. 485–494. Since Ward's silence was not a representation, a requisite element of equitable estoppel is lacking, rendering the doctrine inapplicable.

We conclude Bullock was not Ward's agent in negotiating the extension agreement, Ward did not ratify the extension agreement, and Ward is not estopped from denying the extension agreement. It cannot be said the extension agreement was binding on Ward.

Pillsbury's first assignment is without merit.

II. Pillsbury's second assignment asserts it was error for the trial court to find Pillsbury breached the contract so as to allow Ward to repudiate it. The assignment is controlled by § 554.2610, The Code, which provides:

"*Anticipatory repudiation.* When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

"(a) for a commercially reasonable time await performance by the repudiating party; or

"(b) resort to any remedy for breach (section 554.2703 or 554.2711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

"(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 554.2704)."

To apply the foregoing section it is first necessary to determine whether Pillsbury repudiated the contract. Repudiation is not defined in the Code. However the official comments to the Uniform Commercial Code state:

" * * * [A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.

" * * *

"It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation. * * * [W]hen under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation." 35 I.C.A. 556, 557. See *Lane v. Crescent Beach Lodge & Resort, Inc.,* 199 N.W.2d 78, 82–83 (Iowa 1972); *Sprague, Warner & Co. v. Iowa Mercantile Co.,* 186 Iowa 488, 172 N.W. 637 (1919); *Bonebrake v. Cox,* 499 F.2d 951, 961 (8 Cir. 1974); 67 Am.Jur.2d, Sales, § 311, pp. 449–451; 77 C.J.S. Sales §§ 98–99, pp. 788–791.

In light of the foregoing definition we believe the trial court was justified in holding Pillsbury repudiated the contract. The trial court believed Ward indicated he wished to deliver the soybeans and was notified the delivery date had been extended into February. The trial court also believed Ward was told the reason for the extension was Pillsbury's inability to accept

the soybeans. There was substantial evidence to support these findings which essentially amount to a holding Pillsbury communicated to Ward oral notice it could not accept delivery of the beans until February. Such a communication was a repudiation of the delivery Ward proffered in accordance with the contract.

It remains to consider whether Pillsbury's repudiation substantially impaired the value of the contract to Ward. Only if there was substantial impairment was Ward entitled to the remedies prescribed in § 554.2610. In the official comments to the Uniform Commercial Code substantial impairment is described as follows:

"The test chosen to justify an aggrieved party's action under this section is the same as that in the section on breach in installment contracts—namely the substantial value of the contract. The most useful test of substantial value is to determine whether material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." 35 I.C.A. 556, 557. See also *Fredonia Broadcasting Corp., Inc. v. RCA Corporation,* 481 F.2d 781, 794 (5 Cir. 1973); 67 Am.Jur.2d, Sales, § 311, p. 450.

Under this test the question becomes whether material inconvenience or injustice would have resulted to Ward if he had been required to wait until February for acceptance of his soybeans by Pillsbury. The record is clear injustice and inconvenience would have resulted. The price of soybeans was increasing daily. The cost to Ward of making up his 1000 bushel shortage would have increased materially if he were forced to wait for a February delivery date. It is clear Pillsbury believed the time of delivery was an important item in the contract. The contract provided in part:

"When shipments or truck pickups are not made according to contract we reserve the right without further notice to extend time of shipment or pickup, cancel or buy in the grain for the seller's account, unless, at seller's request previous to expiration of limit of time, other arrangements are mutually agreed upon covering seller's failure to make shipment or have available for truck pickup within specified time of this contract. * * *."

In *Nora Springs Cooperative Company,* supra, 247 N.W.2d at 749 we said:

" * * * In *Maytag Co. v. Alward,* 253 Iowa 455, 465–466, 112 N.W.2d 654, 660 we held rescission is only permitted where the breach is so substantial as to defeat the object of the contracting parties. Whether a breach is material obviously depends on the factual circumstances but generally delay in acceptance of perishable goods is more likely to be found material than delay in another type of contract. (Authorities)."

We hold Pillsbury repudiated the contract and thereby substantially impaired the value of the contract to Ward. We are left with the question of what Ward could do about such repudiation. His remedies are outlined in chapter 554, The Code. He could await performance by Pillsbury for a commercially reasonable time as authorized by § 554.2610(a) or he could resort to any remedy for breach as authorized by § 554.-2610(b). Ward chose not to await performance. When he received the extension agreement from Pillsbury he responded with a letter cancelling the contract, thereby choosing to resort to a remedy for breach. A seller's remedies for breach are specified in § 554.2703, The Code:

"Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 554.2612), then also with respect to the whole undelivered balance, the aggrieved seller may

" * * *

"(f) cancel."

Ward was authorized by § 554.2703(f) to cancel the agreement.

Pillsbury's second assignment is without merit.

III. In another assignment Pillsbury challenges a trial court ruling that Pillsbury failed to establish damages. By reason of our resolution of Pillsbury's first two assignments the third is moot.

AFFIRMED.

MOORE, C. J., and UHLENHOPP, J., concur.

McCORMICK and MASON, JJ., concur specially.

McCORMICK, Justice (concurring specially).

The trial court based its decision on a finding that Pillsbury breached the contract by making an unauthorized agreement with Bullock, the trucker, to extend it into February. This finding has substantial support in the following testimony of Bullock:

Q. * * * Do you remember when you called him, Dale? A. I'd say it was about 4:30 in the afternoon on the 25th.

Q. And why did you call him? A. Tell him I was going to come with Ward's beans.

Q. All right. Did you talk with Mr. Aden? A. I did.

Q. And to the best of your recollection, will you tell us what he said, and what you said? A. Well, he said that, "We are filled up to our ears." And as we talked, he said that I could come, and in the agreement, we decided to leave them sit for a spell. I said, "They are in the bin, and we just as well leave them set."

Q. No, who decided? A. Del and I.

Q. All right. He told you that they were full up to their ears, you say? A. Uh-huh. (yes).

Q. All right. Now, what happened after that? A. Well, that was the end of me—

Q. All right. A. After Del and I made the agreement that we would run them over, why, that was the end of our conversation.

Q. Now, what do you mean by "run them over"? A. Well, run them into February.

Pillsbury did not contend in the trial court that Bullock made this agreement as Ward's agent. Instead, Pillsbury relied wholly on its contention that Ward orally agreed to extend the contract in his January 27 conversation with Pillsbury's employee Aden. Having failed to urge its present agency claim in the trial court, Pillsbury may not rely on it here. For this reason, I do not join division I of the court's opinion.

Moreover, I do not join division II of the opinion because I do not think the trial court found Aden told Ward the reason for the extension was Pillsbury's inability to accept the soybeans. Instead I think the trial court based its finding of repudiation on the agreement between Pillsbury and Bullock. However, because the trial court's finding is supported by substantial evidence and under principles explained in division II of the majority opinion sustains the holding, I concur in the result.

MASON, J., joins this special concurrence.