**WELLS FARGO FINANCIAL LEASING, INC., f/k/a Norwest Financial Leasing, Inc., Plaintiff,**

v.

**LMT–FETTE, INC., Defendant.**

**LMT–Fette, Inc., Third Party Plaintiff,**

v.

**Parts Unlimited, Inc., d/b/a Standard Office Systems, Inc., and Joseph Nader, Third Party Defendants.**

No. 4:02–CV–40210.

United States District Court,
S.D. Iowa,
Central Division.

March 14, 2003.

---

Brian L. Stowe, Finley Alt Smith Scharnberg Craig, Des Moines, IA, for Plaintiff.

Christopherson R. Sackett, Sean P. Moore, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter comes before the Court on Plaintiff's Motion for Summary Judgment. A hearing on the Motion was held on December 6, 2002. Plaintiff was represented by Brian Stow; Defendant was represented by Ann Kendall. Third–Party Defendants have not made an appearance in the case and are not named as parties in this Motion.

## I. SUMMARY OF MATERIAL FACTS [1]

In June 2001, Joe Nader ("Nader") of Standard Office Systems ("SOS")[2], contacted Robert Rubenstahl ("Rubenstahl"), President of LMT–Fette, Inc. ("LMT"), about purchasing an in-house copy machine. Rubenstahl told Nader that LMT was not interested in purchasing the machine; however, Nader persuaded Rubenstahl, explaining LMT could lease the equipment on a trial basis with no obligation to buy. Rubenstahl agreed to a trial lease only because of Nader's assurance LMT would be under no obligation to buy the equipment.

In order to secure financing for the lease, Nader presented Rubenstahl with a pre-printed Wells Fargo Financial Leasing, Inc. ("Wells Fargo"), credit application and lease agreement.[3] Based upon his prior business experience with Nader, Rubenstahl had no reservations about signing the pre-printed documents before Nader entered all the information and terms. Nader explained the documents were merely protocol.

The first page of the lease agreement requested the name and address of the vendor and lessee, description of the equipment, terms of the transaction, and the signatures of the lessor and lessee. The second page had various pre-printed clauses detailing the terms of the lease agreement.[4] The credit application called

---

1. For purposes of this analysis, the Court accepts the nonmoving party's factual allegations and provides that party all justifiable inferences. *See, e.g., Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Some additional facts are noted in the Discussion section of this Order.

2. Parts Unlimited, Inc., d/b/a Standard Office Systems.

3. The record does not provide information regarding the circumstances under which Nader gained access to these pre-printed Wells Fargo forms or had the right to distribute the forms to prospective lessees.

4. Among the clauses were (1) a rent/term of lease clause; (2) a payment clause; (3) an assignment clause; and (4) a terms of default

for vendor and equipment information and had a signature block labeled "Delivery and Acceptance Certificate". Rubenstahl signed and initialed the documents allowing Nader to later complete them. Nader listed SOS as the vendor, LMT as vendee, $5,362.50 as the monthly payment amount, and sixty (60) months as the payment term.[5] Nader submitted the documents, and Wells Fargo approved the lease.

Rubenstahl contacted Nader before the equipment was delivered and told him LMT was no longer in a position to lease the equipment even on a trial basis. Nader told Rubenstahl not to worry, LMT was under no obligation, and SOS would take over the lease. Rubenstahl did not contact Wells Fargo about this arrangement. Rubenstahl denies ever receiving the equipment, although the equipment invoice bears his stamped signature.

Rubenstahl received a Wells Fargo billing statement indicating $5,362.50 was due on the equipment lease. Rubenstahl contacted Nader wondering why LMT received the bill. Nader explained that the mailing address was wrong on the statement; it should have been addressed to SOS. Nader promised to take care of the error. Rubenstahl asked Nader whether SOS was going to maintain the lease or cancel it. Nader explained that SOS was going to maintain and "buyout" the lease. Once again, Rubenstahl did not contact Wells Fargo.

A second bill was received by LMT, and Rubenstahl again contacted Nader. Nader explained the address problem had not been straightened out but assured Ruben-

stahl that he would resolve the problem. Again, Rubenstahl did not contact Wells Fargo.

LMT received a third bill and a telephone call from a Wells Fargo credit agent inquiring about the delinquent account. Rubenstahl told the agent he cancelled the lease. He explained SOS was the responsible party because SOS was buying out the lease. The agent informed Rubenstahl that Wells Fargo considered LMT responsible for the lease.

Rubenstahl contacted Nader, who reassured him there was nothing to worry about and that it was only a paperwork problem. Nader further explained that he was a "subagent" for Wells Fargo and was authorized to transfer leases.[6] Rubenstahl received another telephone call, this time from a Wells Fargo attorney. Rubenstahl again explained the SOS–LMT arrangement and was again informed LMT was responsible for the lease.

Rubenstahl went to Nader's office and told him about the call from the Wells Fargo attorney. Nader divulged that an SOS employee had been "playing games" with the lease and had been fired. Rubenstahl requested a letter from Nader detailing the lease arrangement between SOS and LMT. The letter stated SOS held LMT "harmless" for any debt associated with Wells Fargo Financial Services and that further inquiries should be directed to Nader at SOS. The letter also stated SOS had possession of the equipment and SOS would "continue" to make payments per the terms of the lease. It further prom-

---

clause. The default clause specified in the event of default, the lessee was obligated not only to pay the out-standing balance on the lease, but other costs as well, including reasonable attorney's fees, $250 for collection costs, and $250 for repossession costs.

**5.** Rubenstahl states that when he signed the lease, he was aware LMT would be responsi-

ble for monthly payments; however, he was under the impression the payments would be considerably less than $5,362.50.

**6.** This is the first time indicated in the record that Nader makes the representation to anyone at LMT that he is a "subagent" for Wells Fargo for any purpose.

ised SOS would indemnify LMT for attorney's fees and costs. Once again Nader assured Rubenstahl there was nothing to worry about because a buyout of the lease was in progress.

A Wells Fargo representative contacted Rubenstahl to inform him LMT was in default and the accelerated balance of $327,199.99 was due. Rubenstahl was also informed that Wells Fargo intended to litigate the matter. At this point, Rubenstahl requested a telephone conference with Nader and Wells Fargo.

During the conference call meeting, Wells Fargo agreed to dismiss the lawsuit if a payment of $50,000 was made by April 30, 2002, followed by a second payment of $275,000. Although it was agreed during this discussion that SOS would make those payments, Wells Fargo made it clear that receipt of payment from SOS did not release LMT from liability on the lease. Wells Fargo received $50,000 but never received the $275,000 payment; and, therefore, Wells Fargo did not dismiss the lawsuit.[7]

Plaintiff Wells Fargo moves for summary judgment, arguing it is entitled to judgment as a matter of law because it is undisputed Defendant LMT had a binding lease agreement with Wells Fargo and defaulted on that agreement. Defendant LMT resists the motion, pleading the affirmative defenses of fraudulent misrepresentation, negligent misrepresentation, and novation.

## II. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the af-

fidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact". *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage*, 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986). "'On summary judgment the inferences to be drawn from

---

**7.** Wells Fargo states 3.29 payments were made on the lease prior to filing this lawsuit; it is unclear who made those payments.

the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.*, 757 F.2d 200, 203 (8th Cir.1985). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987).

## III. DISCUSSION

Wells Fargo argues LMT signed an equipment lease agreement and credit application which induced Wells Fargo to provide financing. Wells Fargo further argues the agreement clearly and unambiguously requires LMT to make monthly payments to Wells Fargo. Because LMT has failed to make those required payments, Wells Fargo asserts it is entitled to summary judgment and money damages.[8]

LMT does not dispute the plain language of the agreement; rather, it denies any responsibility in the agreement. First, LMT argues Nader's fraudulent and negligent misrepresentations on behalf of SOS *and Wells Fargo* caused LMT to enter into the agreement. Next, LMT argues a novation occurred when Wells Fargo accepted payment from SOS, thereby relieving LMT of liability in the lease agreement.

### A. *Fraudulent Misrepresentation*

LMT argues Iowa courts recognize the affirmative defense of fraudulent misrepre-

sentation in an action at law for breach of contract. *See Dishman v. Am. Gen. Assurance Co.*, 193 F.Supp.2d 1119, 1126 (N.D.Iowa 2002) (noting the implicit conclusion of the Iowa Supreme Court in *Higgins v. Blue Cross of W. Iowa & S.D.*, 319 N.W.2d 232 (Iowa 1982), "that there is, or should be, some symmetry between the elements of a *claim* of fraudulent misrepresentation in an action at law and an *affirmative defense* based on misrepresentation in an action at law for breach of contract.").

Assuming the affirmative defense of misrepresentation is available in Iowa, LMT must establish that (1) Wells Fargo made a false representation or non-disclosure in connection with the agreement; (2) the representation or non-disclosure was material to the transaction; (3) Wells Fargo made the representation with actual knowledge of its falsity or reckless disregard of whether it was true or false or knowingly withheld material information; (4) Wells Fargo intended to deceive; (5) LMT relied on the representation or non-disclosure in agreeing to the contract; and (6) LMT would not have agreed to the contract if it had known the true facts. *Id.* (citing *Higgins*, 319 N.W.2d at 236–37).

As proof Wells Fargo made fraudulent misrepresentations, LMT argues *Nader* clearly made misrepresentations in securing the agreement. *Nader* presented a blank pre-printed agreement, *Nader* represented the paperwork was mere protocol, and *Nader* lead LMT to believe it was not responsible for the payments. Even if the Court accepts all these allegations as true, LMT has only shown that *Nader* made these representations, not *Wells Fargo.*

---

8. The claimed damages are the accelerated balance on the lease ($327,199.99) and attor- ney's fees and other costs.

LMT argues Nader's representations should be imputed to Wells Fargo because Nader was a subagent for Wells Fargo. LMT bases this argument on Nader's own assertion that he was a Wells Fargo subagent and the general circumstances under which Nader presented the lease agreement to LMT and Wells Fargo later accepted the lease. There is no evidence Wells Fargo ever made express representations to LMT that Nader was its subagent.

"An agency relationship is a fiduciary relationship resulting from the manifestation of consent by one person, the 'principal,' that another, the 'agent,' shall act on the former's behalf and subject to the former's control, and consent by the other so to act." *Farmers Grain Co. v. Irving*, 401 N.W.2d 596, 601 (Iowa Ct.App.1986) (citing *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977)). "The burden of proving an agency relationship is upon the party asserting its existence." *Id.* (citing *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 789 (Iowa 1985)).

■ In Iowa, an agency relationship can be established if the agent possesses express, implied, or apparent authority. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 736 (8th Cir.1987); *see Fort Dodge Creamery Co. v. Commercial State Bank*, 417 N.W.2d 245, 246 (Iowa Ct.App.1987) (citing *Fed. Land Bank of Omaha v. Union Bank & Trust Co. of Ottumwa*, 228 Iowa 205, 290 N.W. 512, 514–15 (1940)). An agent possesses actual authority if it has "either expressly or by implication" been granted authority to act on the principal's behalf. *AgriStor*, 826 F.2d at 738 (citing *Grismore v. Consol. Prods. Co.*, 232 Iowa 328, 5 N.W.2d 646, 651 (1942)). " 'Apparent authority, or ostensible authority, . . . is that which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing.' " *Id.* (quoting *Mayrath Co.*

*v. Helgeson*, 258 Iowa 543, 139 N.W.2d 303, 306 (1966)).

■ "Actual authority includes both express, and implied, authority." *Grismore*, 5 N.W.2d at 651. Therefore, an agent has express authority if there is direct evidence the principal has granted that agent authority to act on its behalf. *Id.* If such evidence is only circumstantial, the authority may be implied. *Id.* (" 'Implied authority is said to be actual authority circumstantially proved—the authority which the principal intended the agent to possess.' ") (quoting *Nertney v. Nat'l. F. Ins. Co.*, 199 Iowa 1358, 203 N.W. 826, 827 (Iowa 1925)). Actual authority or agency "focuses on communications and contacts between the principal and the agent". *AgriStor*, 826 F.2d at 737; *see* Restatement (Third) of Agency § 2.03 (Tentative Draft No. 2, 2001) ("An agent has actual authority to take action designated or implied in the principal's manifestations and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands them when the agent determines how to act.").

■ Apparent authority, on the other hand, is "determined by what the principal does, rather than by any acts of the agent". *Grismore*, 5 N.W.2d at 651. *See* Restatement (Third) of Agency § 2.03 (Tentative Draft No. 2, 2001) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

In a case based on Iowa agency law, the Eighth Circuit found there was enough evidence in the record to raise a jury question on the existence of an agency relationship between a financing company and an equipment dealership. *AgriStor*

*Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987). In *AgriStor Leasing v. Farrow*, defendants entered into an eight-year equipment lease arranged by Hawkeye Harvestore and financed by Agristor Leasing. *Id.* at 735–36. To procure the lease, Hawkeye assured the defendants they could lease the equipment for a year for a flat fee of $19,500 and then return the equipment at the end of the first year with no obligation to buy it. *Id.* at 736. Based on this information, defendants signed an Agristor lease agreement without reading the lease terms. *Id.*

One year later, defendants attempted to return the equipment and cancel the lease but Agristor informed them the agreement they signed prohibited cancellation without full payment. *Id.* Defendants refused to make further payments, so Agristor brought a lawsuit seeking damages and replevin. *Id.* at 733. Defendants denied liability and counterclaimed, arguing Hawkeye's misrepresentations induced them to enter into the agreement and those misrepresentations were imputed to Agristor because of the agency relationship between Hawkeye and Agristor. *Id.* The district court granted Agristor's motion for summary judgment, finding the defendants had not raised a genuine issue of fact regarding the agency relationship; specifically, defendants had not proven Agristor exerted control over Hawkeye. *Id.*

The Eighth Circuit Court of Appeals reversed, finding defendants adequately demonstrated that Hawkeye acted on Agristor's behalf in securing the lease. *Id.* at 735. Defendants' proof was that (1) Hawkeye and Agristor had been doing business for several years; (2) Agristor utilized Hawkeye's workforce to offer Agristor's financing to customers; (3) Hawkeye employees explained Agristor's leasing programs and obtained all required signatures; (4) Agristor bought the equipment from the manufacturer and then leased the equipment to Hawkeye's approved customer; (5) Hawkeye assisted in reselling equipment Agristor owned at the end of the lease period; and (6) Agristor trained Hawkeye employees to implement the Agristor's leasing program. *Id.* The Eighth Circuit found this evidence raised a claim of apparent authority and created an issue of fact. *Id.* at 739.

■ In the present case, LMT has not provided similar evidence that Nader or SOS had an agency relationship with Wells Fargo. There is no evidence in the record to indicate Wells Fargo ever gave Nader express authority to act on its behalf. The only circumstantial evidence of such authority is Nader's possession of Wells Fargo leasing documents and his own much later assertion he was a "subagent" with the authority to transfer leases. There is no evidence Wells Fargo had an exclusive leasing arrangement with Nader or SOS, nor is there evidence Wells Fargo exerted control over Nader or trained him to promote Wells Fargo's leasing plan, nor that Nader received any kind of compensation for securing a lease through Wells Fargo rather than any other lender. Therefore, the record before the Court does not create a fact question regarding an actual agency relationship between Wells Fargo and Nader.

■ Nor is there evidence Nader had the apparent authority to act on Wells Fargo's behalf. The only proof LMT offers of an agency relationship between Nader and Wells Fargo is Nader's own representation that he acted as a subagent and had some power to influence the manner in which Wells Fargo would respond to LMT's concerns. This representation was not made at the time LMT executed the incomplete lease agreement, but much later in connection with the emerging dispute. Thus, Rubenstahl and LMT could

not have been relying upon that representation at the time of entering into the transaction.

The record provides no indication that Wells Fargo did anything to otherwise bolster Nader's later assertion regarding agency status. On the contrary, the record shows Wells Fargo repeatedly denied that Nader's statements had any bearing on the lease agreement. Both the Wells Fargo credit agent and the Wells Fargo attorney told Rubenstahl that LMT, not Nader or SOS, was responsible for the lease. Furthermore, Wells Fargo states in an affidavit that Nader has never been an employee or agent of Wells Fargo. More importantly, the second page of the Wells Fargo lease agreement states in capital letters:

> YOU UNDERSTAND THAT WE ARE A SEPARATE AND INDEPENDENT COMPANY FROM ANY VENDOR OR MANUFACTURER AND THAT NEITHER THE VENDOR NOR ANY OTHER PERSON IS OUR AGENT. YOU AGREE THAT NO REPRESENTATION, GUARANTEE OR WARRANTY BY THE VENDOR OR OTHER PERSON IS BINDING ON US, AND NO BREACH BY THE VENDOR OR OTHER PERSON WILL EXCUSE YOUR OBLIGATIONS TO US.

Rubenstahl's initials appear immediately below that declaration. Contrary to LMT's assertion, there is no record support upon which to conclude an agency relationship existed between Nader and Wells Fargo. LMT's unsubstantiated allegation of an agency relationship does not create a jury question.

### B. *Negligent Misrepresentation*

Alternatively, Defendant argues Nader's failure to exercise reasonable care or competence constitutes negligent misrepresentation. Like LMT's fraudulent misrepresentation defense, to prevail on a negligent misrepresentation defense, LMT must

show an agency relationship between Nader and Wells Fargo. Because no agency relationship can be found, it is unnecessary to discuss the merits of LMT's negligent misrepresentation defense.

### C. *Novation*

 LMT's final defense is that a novation occurred when Wells Fargo agreed to accept payment from SOS. "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts § 280 (1981).

 "To establish a substitution or novation of a contract, the claimant must show (1) a previous valid obligation, (2) agreement of all parties to the new contract, (3) extinguishment of the old contract, and (4) validity of the new contract." *Klipp v. Iowa Grain Indem. Fund Bd.*, 502 N.W.2d 9, 11 (Iowa 1993) (citing *Eitzen's Estate v. Lauman*, 231 Iowa 1169, 3 N.W.2d 546, 549 (1942)). A novation is not easily established. *Id.* "The burden of proving a novation rests upon him who asserts it, and where a novation is pleaded in defense the burden of establishing it is on the defendant." *In re Estate of Eitzen*, 3 N.W.2d at 550.

 LMT suggests there is evidence Wells Fargo agreed to have SOS and Nader assume liability under the lease agreement during the phone conference and that this evidence raises a genuine issue of material fact as to the responsible party. The Court disagrees. LMT must present more than a mere allegation of a novation to survive Wells Fargo's summary judgment motion.

Wells Fargo clearly and repeatedly expressed that LMT was the party responsible for the lease. In the telephone conference between the parties, Wells Fargo told LMT it would dismiss the lawsuit if a

payment of $50,000 was received by April 30, 2002, followed by a second payment of $275,000. Only the $50,000 payment was received, so Wells Fargo did not dismiss the lawsuit. In addition, Wells Fargo argues a novation could not occur absent a writing since the lease agreement required any modifications be in writing.[9]

LMT has failed to establish a novation occurred when Wells Fargo agreed to the two payments. Of the four elements necessary to show a novation occurred, LMT has shown only that there was a valid previous obligation. LMT failed to generate a factual issue over whether there was a valid new contract, an extinguishment of the old contract, or an agreement of all parties to a new contract. In fact, the only available record suggests the contrary. Therefore, LMT's "evidence" of a novation is merely an allegation and does not create a "genuine issue of material fact". *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

## IV. CONCLUSION

In viewing the evidence in the light most favorable to LMT, the Court finds there is no genuine issue of material fact, and this case may be decided as a matter of law. LMT was clearly provided with documentation to indicate it was entering a lease agreement with Wells Fargo. LMT took a substantial risk by executing the incomplete agreement without adequate knowledge of the details, and perhaps in reliance upon misrepresentations by Nader; but, the LMT action resulted in Wells Fargo advancing the funds for the equipment. LMT may have a claim against SOS under these circumstances, but Wells Fargo may also exercise its rights under the agreement.

LMT entered into a binding lease agreement with Wells Fargo. Failure to make payments as set forth in that agreement constitutes a breach. Representations made by a third party to the contract do not relieve LMT of its obligation under the agreement. For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Clerk's No. 8) is **GRANTED**.

While the liability under the lease has been in dispute, the record reflects no dispute over the claimed amounts as a result of a default under the lease provisions. In the event of default, the lease agreement provides for an accelerated balance, which in this case amounts to $327,199.99, plus expenses of $500.00 and reasonable attorney's fees. The Plaintiff claims attorney fees of $4,600.00, which are not itemized but which the Court finds are well within the reasonable range for the necessary legal services in this matter. Therefore, the Plaintiff shall have judgment in this matter in the amount of $332,299.99 and costs of this action against the Defendant. The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

---

9. The following declaration appears on the first page of the lease agreement:

> You agree to all the terms and conditions shown above and on the reverse side of the Lease, that those terms and conditions are a complete and exclusive statement of our agreement and that they may be modified only be [sic] written agreement between you and us. Terms or oral promises which are not contained in this written Lease may not be legally enforced.

Pl.'s Statement of Undisputed Facts, Ex. A (Clerk's No. 10).